# 25-753-cr

**To be argued by:**
**ALLEGRA GLASHAUSSER**

_____
_____

United States Court of Appeals
For the Second Circuit
_____

Docket No. 25-753-cr
_____

UNITED STATES OF AMERICA,

Appellant,

-against-

TYLER SCOTT JOHNSTON,

Defendant-Appellee.

_____

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

**REDACTED BRIEF FOR DEFENDANT-APPELLEE**
**TYLER SCOTT JOHNSTON**

_____

Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

_Attorney for Defendant-Appellee_
**TYLER SCOTT JOHNSTON**

**ALLEGRA GLASHAUSSER**, _Of Counsel_

# Table of Contents

Table of Authorities ...................................................................................................iv

Introduction ..........................................................................................................1

Questions Presented ............................................................................................3

Statement of Facts ...............................................................................................4

    *Daubert* motion and hearing .............................................................................5

        The basics of DNA testing ...................................................................6

        DNA analysts use "likelihood ratios" to describe the probability that a person's DNA is included in a sample ..............................................................8

        The Army Lab's limited testing capabilities for DNA mixtures of biological relatives ..............................................................................................10

        Allele sharing of biologically related people makes it challenging to determine the number of contributors to a DNA mixture ..................................11

        Green's testing of stains that could have been left at any time ...........................14

        Green reached the unsurprising conclusion that the communal family comforter more likely included DNA of Mr. Johnston, his wife, and their daughter, than it included DNA of the Johnstons and a stranger .....................16

        After the hearing, the government revealed that Doe spent leisure time on the bed and that the youngest two children slept in the bed every night ...........20

        Ruling excluding the DNA evidence ........................................................21

        Government's inclusion in the appellate brief of misleading information irrelevant to this interlocutory appeal ........................................................24

Summary of Argument ........................................................................................27

Standard of Review .............................................................................................28

i

Argument

Point I

The district court acted within its broad discretion by excluding the DNA evidence from a communal family comforter used by six biological relatives, when the lab lacked a validated capability to evaluate DNA mixtures involving biological relatives and the government failed to provide the analyst key information ................29

    I.    The district court must exclude expert testimony that isn't reliable and relevant ........................................................................................30

    II.    Because of the limitations of the Army Lab in testing mixtures involving biological relatives and the government's failure to provide the analyst necessary facts, the evidence failed to meet the standards of Rule 702 ........32

    III.    The court's detailed analysis of the 702 factors was not "manifestly erroneous"................................................................................33

Point II

The government's contrary argument, which relies on crucial factual errors and omissions, fails to demonstrate that the district court manifestly erred in excluding DNA evidence when the lab's testing ability was limited and the analyst lacked critical facts ................................................................................................39

    I.    The government's brief relies on misleading presentations of the facts and material factual omissions ................................................40

    II.    The government points to no material factual errors in the district court's analysis, no less "manifest" errors ....................................................42

        1.   The Army Lab didn't have a valid procedure for biological relatives......43

        2.   There is no record support for the government's assertion that the analysis wasn't "complex" ...........................................................45

        3.   It was appropriate for the court to discuss error rates as one factor of many................................................................................45

4.   The court accurately recounted Kalafut's testimony that a child was "most likely" "masked" in one stain and accurately discussed the government's failure to provide DNA samples so the analyst could properly "condition" her analysis ............................................... 46

III.   That the evidence was unreliable because the lab didn't have a reliable method to test DNA involving biological relatives couldn't be cured by cross-examination ......................................................................... 48

Point III

The district court acted within its broad discretion by excluding the DNA evidence as irrelevant and unfairly prejudicial given that the parties agreed that it was more likely that DNA from Mr. Johnston, his wife Monica, and their daughter Jane Doe was on the communal family comforter than that DNA from a stranger was on their comforter ................................................................ 49

I.   The government's arguments about major and minor contributors being relevant to how DNA got on the bed are unsupported ................................. 51

II.   None of the government's hodgepodge of other arguments are persuasive ....................................................................................................... 52

III.   The government fails to meaningfully dispute the court's conclusion that this evidence was unfairly prejudicial ................................................. 54

Conclusion ......................................................................................................... 56

## Table of Authorities

**Cases**                                                                                      **Page(s)**

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002)................................................................28, 32, 48

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996) ..........................................................................48-49

*Daubert v. Merrell Dow Pharmaceuticals,*
    509 U.S. 579 (1993) ...................................................30, 31, 33, 48, 54

*In re Pfizer Inc. Sec. Litig.,*
    819 F.3d 642 (2d Cir. 2016).............................................................................49

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) ...........................................................................29, 31

*i4i Ltd. P'ship v. Microsoft Corp.,*
    598 F.3d 831 (Fed. Cir. 2010) ......................................................................48

*Nimely v. New York,*
    414 F.3d 381 (2d Cir. 2005)............................................................................32

*United States v. Al-Moayad,*
    545 F.3d 139 (2d Cir. 2008).............................................................................54

*United States v. Cantoni,*
    No. 19-4358-CR, 2022 WL 211211 (2d Cir. Jan. 25, 2022) .........................................28

*United States v. Gissantaner,*
    990 F.3d 457 (6th Cir. 2021) ......................................................................36

*United States v. Green,*
    No. 22-3217, 2024 WL 4488577 (2d Cir. Oct. 15, 2024) ...............................29, 36, 37

*United States v. Jones,*
    965 F.3d 149 (2d Cir. 2020)........................................................................28, 36

iv

*United States v. Lewis*,
442 F. Supp. 3d 1122 (D. Minn. 2020) ...............................................35, 36, 37

*United States v. Mitchell*,
365 F.3d 215 (3d Cir. 2004) ........................................................................38

*United States v. Ortiz*,
736 F. Supp. 3d 895 (S.D. Cal. 2024) .....................................................35, 36

*United States v. Paulino*,
445 F.3d 211 (2d Cir. 2006) ........................................................................29

*United States v. Pepin*,
514 F.3d 193 (2d Cir. 2008) ........................................................................53

*United States v. Russell*,
No. 22-50056, 2024 WL 4054382 (9th Cir. Sept. 5, 2024) ........................35

*United States v. Williams*,
382 F. Supp. 3d 928 (N.D. Cal. 2019) .....................................34, 35, 48, 55

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007) ........................................................................31

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) ....................................................................................32

**Rules**

Fed. R. Evid. 401 ...................................................3, 22, 23, 28, 29, 50

Fed. R. Evid. 403 ...................................................3, 22, 28, 29, 54, 55

Fed. R. Evid. 702 ...................................................................30, 31, 33

**Other Authorities**

J. Buckleton et al., *Helping Formulate Propositions in Forensic DNA Analysis*, 54 Sci. &
Just. 258 (2014).........................................................................................38

v

Ted Hunt, *Activity Level Testimony in U.S. Courts: A Legal Problem*, U. KAN. L. REV., Volume 74 (forthcoming 2025), available at https://ssrn.com/abstract=5233773.38

John W. Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability and, Form*, 71 OR. L. REV. 349 (1992) ........................55

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

Docket No.   25-753
_____

UNITED STATES OF AMERICA,

Appellant,

-against-

TYLER SCOTT JOHNSTON,

Defendant-Appellee.
_____

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

BRIEF FOR APPELLEE TYLER SCOTT JOHNSTON
_____

### Introduction

Tyler Scott Johnston is a United States Army combat veteran, who lived in a small apartment with his wife Monica Johnston and their four children on an Army base in Brooklyn. He was arrested after his daughter Jane Doe accused him of raping her on a communal family bed. The government sought to introduce DNA evidence from that bed at trial. While awaiting trial, Mr. Johnston has been successfully complying with all his bail conditions for the past 2 ½ years.

This case isn't about the general admissibility of DNA evidence or the general

1

reliability of the STRmix DNA software program. This case is about a highly case-specific application of *Daubert* to DNA testing by the Army Lab of a comforter from the Johnston family bed, which was used by all six family members.

Testing of items likely to include DNA of biological relatives is complicated. Despite that, the lab that did the testing here didn't use a feature of STRmix designed for testing DNA mixtures including biological relatives and lacked any validated method for testing DNA mixtures including biological relatives. It was also missing vital information: the lab lacked DNA samples from three of the Johnstons; and the government failed to tell the analyst that four of the Johnstons – Mr. Johnston, his wife Monica, and two of their children – slept in the bed every night, or that all four children, including Doe, used the bed during the daytime.

Moreover, the government's expert was never going to testify that Mr. Johnston's semen was "mixed with" Doe's DNA, as the government's brief repeatedly claims. Instead, the expert's unremarkable conclusion was that mixtures of DNA on the comforter were more likely from Mr. Johnston, his wife Monica, and Doe than from the Johnstons and a stranger. In this case, that opinion was meaningless: the defense wasn't that a stranger raped Doe, but that no rape occurred.

After extensive briefing and a two-day evidentiary hearing, the court issued a detailed opinion excluding the DNA evidence as unreliable under *Daubert* because of the gaps in the capability of the specific lab and the government's failure to provide

the lab necessary facts, combined with the unusually complex testing required because six biological relatives used the comforter.

The court also independently excluded the evidence as irrelevant under Rule 401, as no party disputed that DNA from Mr. Johnston, Monica, and Doe was on their own comforter. It further excluded the evidence under Rule 403 because allowing the government to present meaningless DNA testimony as if it was relevant to their case would be unduly prejudicial.

The government appealed.

### Questions Presented

1. Did the district court act within its broad discretion in excluding DNA evidence from a communal family comforter used by six biological relatives, when the lab lacked a validated capability to evaluate DNA mixtures involving biological relatives and the government failed to provide the analyst key information?

2. Does the government's contrary argument, which relies on crucial factual errors and omissions, fail to demonstrate that the district court manifestly erred in excluding DNA evidence when the lab's testing ability was limited and the analyst lacked critical facts?

3. Did the district court act within its broad discretion by excluding the DNA evidence as irrelevant and capable of misleading the jury or confusing the issues, when the parties agreed it was more likely that DNA from Mr. Johnston, his wife Monica, and their daughter Jane Doe was on the communal family comforter than that DNA from a stranger was on their comforter?

### Statement of Facts

Mr. Johnston is a United States Army combat veteran, who was working full-time as an active-duty Army staff sergeant. Dkt. 15.[1] He lived in a small apartment with his wife Monica Johnston and their four children, aged 13, 12, 6, and 3, on the Fort Hamilton Army Base. Their two youngest children are Mr. Johnston's and Monica's full biological children. Their two older children, including Doe, who was 13 years old at the time of her father's arrest, are Monica's biological children, whom Mr. Johnston adopted years ago. The children all used their parents' bed: Doe spent leisure time on the bed watching her tablet and her two youngest siblings slept there every night. SA 537.

In April 2021, a school counselor told Doe that the counselor was going to call her parents because Doe had gotten into trouble at school. Dkt. 136. In response, Doe said she did not want her parents called because her father had sexually abused her on her parent's bed and on a couch in the living room, and that Mr. Johnston "smear[ed]" semen into the carpet in the living room. A. 311, 318. Three doctors examined Doe to investigate her allegations; none found trauma or evidence of abuse. Dkt. 136. The government found no relevant DNA in the carpet or on the couch, but sought to introduce evidence from a comforter on the bed.

---

[1] Unless otherwise noted, citations to "Dkt" refer to entries on the docket of ECF No. 23-cr-133.

_Daubert_ motion and hearing

The defense moved to exclude DNA evidence from the comforter, explaining that this case presented a "worst-case scenario for forensic biological analysis," because the complex DNA mixtures were taken from a "marital bed" that could "reasonably" be expected to include DNA from six biological relatives: Mr. Johnston, Monica, Jane Doe, and their other three children. Dkt. 103. As counsel explained, when all of the "persons of interest are _expected_ contributors, kinship [ ] complicat[es] the data, and [where] there is no concrete evidence corroborating sexual contact," the DNA data "becomes both meaningless and extremely dangerous." _Id._

In response, the government argued that biological relationships weren't relevant because Mr. Johnston and Doe weren't biological relatives, as Mr. Johnston had adopted Doe. A. 270-71. Nonetheless, it included an affidavit from Joel Sutton, the DNA Technical Leader at the United States Army Criminal Investigation Lab (the "Army Lab"), which explained that "[a]s it relates to biological relatives, [the Army Lab] does not currently evaluate DNA results to distinguish biological relatives using STRmix," a DNA testing software program. A. 277, 287. The affidavit explained that the lab had not "internally validated STRmix for [that] purpose" and "has not established a process or procedure for distinguishing biological relatives using the STRmix software." A. 287. Instead, the Army Lab would "request[ ] references from all [the biological relatives] to compare their DNA to the biological evidence in

5

question" and use those "pristine profiles from each relative…for analysis and comparison." A. 287.

At a two-day hearing, the government called two witnesses, <u>Sara Green</u>, an Army Lab forensic biologist, and <u>Tim Kalafut</u>, an associate professor at Sam Houston State University. A. 364, 714. Green tested the DNA in this case, while Kalafut reviewed Green's data, without doing any testing himself. A. 727.

<u>The basics of DNA testing</u>

Green and Kalafut described the four basic steps in forensic DNA testing: first, extraction, where the analyst takes a sample, places it in a tube, and adds chemicals and heat, which breaks open the cells and releases the DNA. A. 367. Second, quantitation, a test to determine how much DNA is in the sample. A. 367. Third, amplification, where the analyst creates a "polymerase chain reaction" to make copies of "small areas of DNA, that are called short tandem repeats or STRs." A. 367. Fourth, the analyst creates a visual chart of the DNA profile. A. 367. After those steps, the analyst interprets the DNA. A. 368.

Green, who had been working at the lab for 20 years, and Kalafut, who worked beside her for 19 years, A. 715, defined many terms relevant to DNA testing and their testimony:

- A "mixture" is a DNA profile that contains DNA from more than one person. A. 381.

6

- An "allele" is a segment of DNA represented by a number assigned to the "DNA type." A. 382.

- A "locus" is a location on the chromosome. A. 382.

- A "peak" is how the analyst sees a "piece of DNA" "on a graph." A. 382.

- "Conditioning" is when the analyst "assume[s] someone's DNA [is] in the profile." A. 383. If there is a mixture involving two related people, the analyst should "condition" the mixture on one of the related people to "eliminate[ ] the impact of them sharing 50 percent of their DNA." A. 384. It is "best practice to assume one of those [related] people [is in the mixture] so that they're not impacting the interpretation of the other person." A. 425. Kalafut explained that the "best practices are to condition as much" as possible. A. 737.

- "First order relatives" are parent to child or full siblings. A. 381.

- A "full paternity trio" is the mother, father, and child. A. 732.

- "Differential" is the type of extraction to "separate sperm cells from the rest of the cells." A. 384.

They also explained phrases to use when an analyst incorrectly fails to include a person whose DNA is in a mixture, or incorrectly fails to exclude a person whose DNA isn't in a mixture:

- An "adventitious inclusion" is when someone whose DNA isn't included looks like it is. A. 738.

- "Dropout" happens when a "person may have a very low quantity of DNA in the sample," which can cause that person's DNA not to be "fully detected." A. 382-83. Another way to describe it is when only one of a person's two alleles is detected at a locus. A. 731-32.

- "Masking" is when a person's DNA is present, but there isn't "enough DNA in the sample to" detect it. A. 383. As Kalafut put it, masking is when

7

you "have more than one donor to a sample" who "share some genetic markers," and the "minor donor" gets "kind of hidden" in the results. A. 728.

- "Stacking" is when two people share an allele, which causes the "peak [to] get[ ] taller." A. 383. This is "similar to masking," when there are "multiple contributors in a sample and they have the same allele." A. 729-30. Kalafut explained that, if one of the people "is a much lower level contributor than the other two, it is still stacking but it can be difficult to decide if [there are] only two or…three" people in the mixture. A. 730. In that type of situation, "stacking becomes masking." A. 730.

A "person of interest" is the person who "is not supposed to be in the mixture," meaning someone who "didn't already acknowledge some other incidental contact…or had no other reason to have their DNA on that item." A. 806-07.

### DNA analysts use "likelihood ratios" to describe the probability that a person's DNA is included in a sample.

The Army Lab used a program called STRmix to calculate a "likelihood ratio using probabilistic genotyping." A. 368. STRmix doesn't "answer the question of who contributed to the mixture," but "calculates a likelihood ratio," which "give[s] weight to a DNA inclusion." A. 368, 458. Without this ratio, the analyst can't comment on whether "someone's DNA could be included" in the sample. A. 368.

The likelihood ratio "compares two competing ideas regarding the DNA evidence." A. 368. It "weighs the probability of observing the DNA evidence if a [person's DNA] is in the mixture against the probability of observing the evidence if…[the person's DNA] is not in the mixture." A. 368-70, 458. STRmix is used

8

throughout the field and is the "most commonly used [DNA] software in the United States." A. 369-70.

The question asked in the likelihood ratio is important because DNA "results" "have no intrinsic meaning without [that] context." A. 842. For the "likelihood ratio to have meaning, the relevant information in the case needs to be considered." A. 836-37. The analyst should, thus, include "alternative[ ] [propositions] consistent" with the defense and "the defense should be entitled to all alternatives consistent with exoneration" that can be "appl[ied] to the software." A. 837. Green's default "defense[ ] hypothesis," however, was to run an "unknown, unrelated person" – even though that wasn't the defense's theory of the case. A. 462.

Kalafut testified that the likelihood ratio only compares the probabilities given, so they don't explain whether there is a "better supported third proposition." A. 836, 839. Kalafut explained the problem this way: if the analyst "has bad information… the analyst can only use the information they have." A. 784. If "it turns out the case information is incomplete or one-sided, then that does have a trickle-down effect." A. 784.

Kalafut explained that when the parties agree on whose DNA is on an item – like the comforter here – a likelihood ratio about whose DNA is on the item is "not relevant." A. 843.

9

<u>The Army Lab's limited testing capabilities for DNA mixtures of biological relatives.</u>

The Army Lab was accredited by an outside agency to use STRmix, which means that the lab "follow[s] a certain set of standards." A 370-71. It was also internally validated to use STRmix, which means that the Army Lab "believe[s] this technology is reliable and reproducible." A. 371.

When calculating likelihood ratios, however, the Army Lab could only compare whether the person's DNA is included in the sample "versus the competing idea that it is not their DNA, that it is from some other unknown, unrelated person." A. 369. The Army Lab couldn't compare the likelihood that a DNA mixture included the person of interest versus the idea that it included a biological relative; it could only compare the likelihood that a DNA mixture included the person of interest versus the likelihood that it included a stranger. That is because the Army Lab had no "validated" "protocol" to distinguish between related people or "calculate relatedness likelihood ratios" and simply "does not calculate relatedness likelihood ratios." A. 460.

Because the lab didn't have the capability to distinguish between related people using STRmix, the lab's protocol for mixtures that "could involve a biological relative" was to "interpret and report with caution." A. 567; 680. As their protocol states:

6.7. **Biological relatives** - mixtures involving biological rel tives that cannot be educed into individual contributors should be interpreted and eported with caution due to increased allele sharing. Based on the question being asked (e.g., is it t e POI versus a relative?), no statistical weight may be available or reportable at the DFSC. Consult with the Technical Leader where needed.

A. 680.

Here, Green knew there were six people in the Johnston household and that everyone was related to Monica except Mr. Johnston. A. 462-63. She knew that Doe was related to the other three children, who all shared the same mother, Monica. A. 463. She was told that "various children would be on the bed at some point," "wrestling and playing around." A. 510. The lab's case manager asked for DNA samples from all six Johnston family members and for further information about their biological relationships. A. 510-12; DX A at 152. It was "important to get reference swabs for everyone in the house, if possible," especially because "all [the] kids [had been] on the bed." A. 512. The case manager noted explicitly that "[w]hen families are involved, it can complicate our DNA results." A. 512.

Despite this request, Green only received DNA samples from Monica, Mr. Johnston, and Doe. A. 375-76. Green never got the other requested DNA samples. A. 375-76, 512.

<u>Allele sharing of biologically related people makes it challenging to determine the number of contributors to a DNA mixture.</u>

When a DNA mixture contains multiple related people, who will necessarily share alleles, it is harder to determine how many people contributed to a DNA

11

mixture. Green explained that "multiple contributors, [with] allele sharing" can "make estimating the number of contributors challenging." A. 501.[2] If two people share the same allele, the peak height of that allele increases. A. 419. Because of allele sharing, Green admitted that there is "uncertainty" when "relying on peak heights [to determine the number of contributors] when [considering] first order relatives." A. 539.

Kalafut too relied on peak heights to determine how many people's DNA contributed to a mixture. He cautioned, however, that biology has "randomness." A. 731. He explained that, in a "perfect world," there would be a "peak height balance" for the two alleles at each locus for each person, so if a person had a 10 and 11 at one locus, those peaks would be equal. A. 730. In real life, however, "it's very rare" for peak heights to be equal, and there is "always an amount of randomness. A. 731, 755.

Nonetheless, Kalafut testified that the peaks between alleles from the same contributor at the same locus "should" be "relatively well balanced," with one being 70-90% as tall as the other. A. 731. Immediately after stating this, however, he said that he "would expect two peaks to have a 50 percent or better peak height ratio." A. 731. When asked how he decided to use the 70-90% rule or the 50% rule for peak

---

[2] Allele sharing is not limited to relatives. By happenstance, Monica, Mr. Johnston, and Doe all shared "common alleles" even though Mr. Johnston wasn't biologically related to Monica or Doe. A. 527. Indeed, Mr. Johnston shared 52 percent of his DNA with a combination of Doe and Monica. A. 528. Monica only had eight alleles that were unique from Mr. Johnston and Doe. A. 529-30.

height ratios, Kalafut called it a "moving matrix," and said that the analyst has to "take everything into account." A. 757. The decision about whether peak height imbalance shows a contribution from additional people is "an expert judgment call." A. 758.

Kalafut explained that "[m]ixtures of full biological first order relatives are widely considered to be the hardest mixtures to interpret." A. 867-68. His own research found that "even very experienced analysts may underestimate the correct number of contributors when siblings are involved." A. 794. Kalafut's published research calculated an error rate of 25-33% in mixtures including first-order relatives. A. 867. Similarly, another study found a 21.2% error rate in analysts' estimates of the number of contributors with relatives in the mixtures. A. 791-92. Although Kalafut testified initially that the defense had a "misunderstanding" of his research, A. 733, he later agreed that, like in his research, the potential contributors to the DNA mixtures in Mr. Johnston's case included first-order relatives. A. 787.

Importantly, there was no validated protocol for determining the number of contributors where the potential contributors are related. A. 789-90. Kalafut said that the "process is no different," but it "can be more difficult to come to a conclusion." A. 790. Green agreed that testing is "certainly more complex with biological relatives." A. 569.

Green's testing of stains that could have been left at any time.

Although Green knew that the allegations were that Mr. Johnston had sexually assaulted Doe on the comforter and couch, and rubbed his semen into a carpet, she found no bodily fluids she deemed relevant on the cushions or carpeting and did no DNA testing on those items. A. 608.

She found numerous stains on the family comforter – which Doe told the government was "not common[ly]" washed, SA 538 – and did "presumptive" tests for semen on each of the stains, an "AP color test," and a "prostrate-specific antigen" test. A. 448, 464, 474. The only unique test for semen is one that detects sperm; she didn't find sperm in any of the stains. A. 448, 454.

Semen can persist on fabric for a long time, even after washing. A. 498-99. The first presumptive test can give a positive result for three years, and the second presumptive test can give a positive result up to a year. A. 499. Both presumptive tests can also give positive results for things that aren't semen but would be expected on bedding. The AP color test can test positive for vaginal fluid, feces, chocolate, and other foods. A. 475. As Green testified, when the "test [changes color] for something like chocolate, there's no way [ ] to tell … what triggered it." A. 475. Similarly, the second presumptive test can provide positive results for urine, soap, and detergent. A. 483. If urine and vaginal fluid were in the same stain (or two of the other substances that would test positive), the two tests could both show false positive results even if

14

no semen was present. A. 486-87. Despite this possibility of false positives, based solely on the presumptive tests, Green opined that the "DNA evidence" in eight stains included semen. A 377, 454-55.

When doing this testing, Green presumed that any semen must be from Mr. Johnston, as she didn't know he had a 12-year-old son, who lived in the home. A. 511.[3] Green also didn't know that one of the children who slept in the bed would wet the bed, as the government only provided this information after the *Daubert* hearing. Dkt. 200 (citing SA 537-39).

Green could provide no opinion about when DNA was left on the comforter or whether DNA from different people was left separately or at different times. A. 496. In other words, even if a DNA mixture included semen from Mr. Johnston, Green could provide no information about whether other DNA in the mixture was left at the same time as the semen – for example, whether DNA from his wife was left at the same time as DNA from Mr. Johnston after marital intercourse – or at different times, from people sleeping on the bed, watching a tablet on the bed, or playing on the bed. Green also never performed substrate testing, to test whose DNA was generally on the comforter in areas separate from the stains. A. 491.

---

[3] Although the government states in passing that Mr. Johnston's son was "below the age of 12," Gov. Br. 5, n. 3, the district court record stated that he was 12 years old, Dkt. 103, at 20; A. 977. The government didn't dispute this fact.

<u>Green reached the unsurprising conclusion that the communal family comforter more likely included DNA of Mr. Johnston, his wife, and their daughter, than that it included DNA of the Johnstons and a stranger.</u>

Green tested eight comforter stains. To determine the number of contributors to each, Green looked at the number and height of the peaks, and compared them to the three reference DNA samples she had. A. 406. Green did a "manual analysis," telling STRmix how many contributors were in the mixture. A. 406, 570.

Green testified that if she inputted the wrong number of contributors into STRmix, the "mixture proportions would change dramatically." A. 432. The government's other expert, Kalafut, however, disagreed, explaining that, if the people in the mixture "happen to share [enough] alleles," the number of contributors chosen by the analyst can be wrong, but STRmix won't "catch" the error. A. 740. For example, if the number of contributors was wrong because the analyst failed to account for a masked biological child, STRmix would appear to work, even though the results would be inaccurate. A. 821. Therefore, the lack of a STRmix error wouldn't provide information about whether there was a masked biological child hidden in a mixture. A. 821.

In Mr. Johnston's case, Green lacked reference samples from the two youngest Johnston children, who slept in the bed every night, and of the middle child, who also used the bed during the day. Green testified that "knowing that there's people related, [she] certainly take[s] that into consideration when…looking at number of

16

contributors," but she was "limited by the references [she] received." A. 515.

Green determined that two stains on the comforter had DNA only from Monica. A. 379, 407-08. Despite that conclusion, she said that both stains also included male DNA, which wasn't "detected" after amplification. A. 409. This was an example of "masking": Green could only see the female DNA, even though there was hidden male DNA. A. 409-10.

The other six stains from the comforter were mixtures. A. 411. Monica's DNA was included in all six of the stains. A. 421. Green found that five of the stains – stains 7, 10, 11, 20, and 25 – had three contributors, and that stain 23 had four contributors. A. 421. Kalafut agreed that there were three contributors in stains 7, 10, 11, 20, and 25. A. 741-42. He disagreed with respect to stain 23, testifying that it could have five contributors. A. 865.

Under further questioning, it became clear that at least four of the five stains had more complicated analyses, involving "judgment calls" about indications of additional contributors:

- Stain 7 had a peak at an allele that didn't match Monica, Mr. Johnston, or Doe. A. 562-65, 826.

- Stain 10 was marked by STRmix as excluding Mr. Johnston because one of his alleles wasn't in the mixture. A. 552, 582-83. Green decided that the software had made a mistake and set STRmix to ignore that allele, so that Mr. Johnston could be included. A 552-54.

- Stain 11 had a peak that Green determined was an "artifact" that wasn't a real

piece of DNA, which she "remove[d] from the overall profile." A. 532-33.

- Stain 20 was missing a number of Mr. Johnston's alleles. A. 827-28. Kalafut testified that these missing alleles didn't indicate that Mr. Johnston was excluded because it was his comforter. A. 829.

With respect to stain 7, Kalafut explained that it was a judgment call whether there was evidence of an additional person's DNA in the mixture, admitting that there was "uncertainty." A. 823, 826-27. His case notes explained it was "difficult to rule out any biological children…as masked or hidden donors as a small contributor biological child can fit into their normal peak imbalances" in this stain. A. 788.

With respect to stain 23, Kalafut said that the peak high ratio was "moving towards the 50 percent limit," "towards some uncertainty." A. 744, 760, 765. Kalafut believed that the "most likely" explanation was that a biological child was "masked." A. 748-49. He added that "reasonable experts" could disagree and Kalafut was "not exactly sure what it is within [his] own mind either." A. 765. He concluded that stain 23 was the "exception that proves the rule," and that this sample "act[ed] differently than the others…kind of reinforces [his] opinion about the others being only three [contributors]." A. 765.

To create the likelihood ratio here, Green compared the hypothesis that the DNA mixtures included Monica, Mr. Johnston, and Doe's DNA, against just two other hypotheses: that the mixtures included Monica's DNA and two "unknown, unrelated individuals," or that it included Monica, Mr. Johnston, and one unknown,

unrelated person. A. 441, 459. She didn't consider any hypothesis that a mixture included an "unknown *related*" person. A. 459 (emphasis added). Green acknowledged that she knew that this case presented "a variety of biological relationships, but [she] didn't have the capability through STRmix of taking that into account." A. 464. She "tested the hypothesis that [she] had the capabilities to test." A. 462, 464.

The DNA profile for the five stains Green found to be three-person mixtures were "one quintillion times more likely if they originated" from Monica, Mr. Johnston and Doe than if they originated from Monica and "two unknown individuals." A. 441-45. One quintillion is the "cap" of "the uppermost bound of a likelihood ratio." A. 445. For stain 23, the likelihood ratio was "one quintillion times more likely if they originated" from Monica, Mr. Johnston, Doe, and an unknown person, than if they originated from Monica and "three unknown individuals." A. 445.

The likelihood ratio calculations didn't consider a hypothesis that the mixture included Monica, Mr. Johnston and an unknown, *related* person or multiple unknown, *related* people. A. 459. In other words, the calculations didn't consider the likelihood that DNA from any of the other children were in the mixture either instead of Doe or in addition to Doe. Green's calculations simply "never took relatedness into consideration at all." A. 460.

Despite not having calculated a likelihood ratio for these alternative hypotheses, Kalafut believed there was not "room for" another relative "to be

19

contributing." A. 865. Green said that "[i]f there was a biological child of Monica and [Mr. Johnston] present in those stains…their DNA would be in such a low amount that they are not significantly contributing DNA to the overall mixture." A. 579.

Green expressed uncertainly after she completed her testing, however, and reached out to Kalafut for help, asking if she should "be concerned for court, where I reported semen [ ] probably vasectomized, mixtures of mom, daughter, stepfather, by assuming mom in the mixtures on her own comforter." A. 541-42. Prior to emailing Kalafut, she had already emailed a larger group a similar question seeking "relatedness help." A. 543. She asked for help from four people, including her technical leader, supervisor, and validation officer. A. 543. 3500 material produced by the government reflects that just days before the evidentiary hearing, she emailed the government asking for information about how the children were related. SG-013.

<u>After the hearing, the government revealed that Doe spent leisure time on the bed and that the youngest two children slept in the bed every night.</u>

At oral argument after the hearing, the court asked whether Doe would "say that she was never on the bed other than when the sexual assaults occurred?" A. 891. The government replied flippantly, "Did she ever spend time on this bed? Probably. She's a child in a house. This is where her mother sleeps." A. 893. The government added that while the "younger siblings did, in fact, roughhouse on this bed, Doe was not typically part of that." A. 894.

Only after the hearing testimony and oral argument did the government reveal

20

that Doe spent leisure time on the bed watching her tablet and that her two younger

siblings slept in the bed every night. SA 537; A. 990. Doe stated that she spent the

"least time" in the bed, but that was in comparison with her two youngest siblings

who spent "more time" on the bed because they slept there. SA 537-39. The

government didn't explain how often Doe watched her tablet on the bed.

<u>Ruling excluding the DNA evidence</u>

In a detailed decision excluding the DNA evidence, the court explained that the

"fundamental soundness and general acceptance" of STRmix DNA testing wasn't at

issue. A. 990. This, however, was the "rare case in which uncertainties" about

reliability are so "numerous and consequential" that the court "would fail in its

gatekeeping function if it did not exclude the analyst's testimony from trial." A. 1049.

The court excluded the evidence on two *Daubert* grounds.

<u>First</u>, the government failed to demonstrate that the lab "reliably calculated the

'likelihood ratios' that accompany the DNA results, without which the results have no

statistical weight or significance." A. 974-75. That is because the lab hadn't validated

and had "no option to utilize" the feature of STRmix "applicable to cases, as here,"

where "the defense contends that biological relatives of the persons tested are

potential donors." A. 975, 1024. Without the necessary STRmix feature, Green "was

left with '1 in 1.0 quintillion' likelihood ratios that sound highly discerning, but in fact

21

were meaningless to the resolution of any factual dispute" at trial as no one suggested "strangers" contributed to DNA on the comforter. A. 1024.

Second, the government didn't show that the lab's methods for "determining the number of contributors in complex DNA mixtures" was reliable in a case like this one with a "high" potential for "DNA allele-sharing with biological relatives" and given that the analyst "was not provided with key information needed to make that determination," as the government didn't provide her the necessary DNA reference samples. A. 975, 1035. This conclusion was case-specific – the court noted that the "overall subjectivity" of number of contributor determinations inherent in any analysis wasn't the problem. A. 1040. Instead, here, Green "lacked 'sufficient facts or data' to guide her testing and analysis" because the government "deprive[d] Green of key information…that may well have changed her core assumptions about "expected' donors…and impacted her subsequent analyses." A. 1035, 1049.

The court also pointed out other weaknesses in Green's testimony, including that Green did no sampling to understand the background level of DNA on the comforter and assumed that any semen was from Mr. Johnston, even though his 12-year-old son lived in the same house. A. 1003-04.

Moreover, the court independently excluded the evidence as irrelevant and unduly prejudicial under Rules 401 and 403 because the analysts agreed that it was "*no more likely*" that the DNA profiles seen in these stains were deposited through an act of

sexual assault…than through entirely innocent contact with the comforter…" the evidence didn't meet the "low bar of [Rule 401] relevancy" and there was a "substantial risk" it would "mislead the jury and confuse the issues." A. 975. The court explained the unanimity among the analysts that Green's "testing provides no information that can help answer the question of how, when, and under what circumstances any DNA from these three people" got on the comforter, and that Green's testing can't identify "what substances – semen, saliva, skin cells, etc. – actually produced the DNA profiles." A. 1050.

Thus, scientifically, the government's explanation – that the DNA was placed there because Johnston raped Doe, and the defense explanation – that the DNA was placed there during separate, ordinary contact with the bed, are "equally likely to be true." A. 1050. The court recognized that testimony "need not be conclusive in order to be relevant" and that innocent explanations for evidence doesn't make it irrelevant. A. 1051. But Green's testimony had no "tendency to make a [disputed] fact *more or less probable.*" A. 1050. There was also substantial risk the testimony would "both mislead and confuse the jury," because there is a "significant risk that the jury' would think the DNA results "mean[ ] abuse." A. 1056.

The government appealed this decision.

23

<u>Government's inclusion in the appellate brief of misleading information irrelevant to this interlocutory appeal.</u>

The government's brief and appendix on appeal includes a wealth of misleading and slanted factual assertions. The government presents the unproven allegations of sexual assault as if they are proven facts. They are not. To do so, they rely on discovery, which may not be admitted at trial and is irrelevant to this appeal. For example, the appendix includes a video interview of Doe by an Army investigator. SA 541. This video is the subject of a pending defense motion in limine seeking to preclude it as hearsay. Dkt. 136. Including this irrelevant video is a clear attempt to convince this Court of Mr. Johnston's guilt before his trial and attempt to sway the Court's ruling on the DNA motion by an appeal to emotion.

While presenting this one-sided version of the government's discovery, it also fails to mention that the defense has sought to introduce evidence that undermines Doe's credibility. For example, the defense moved to introduce Doe's internet browsing history, █████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████

24

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ The court hasn't yet ruled on this defense motion, or

the government's other motions to exclude cross-examination "suggesting" that Doe

is violent, including that she "falsely told a classmate on the school bus that Doe had a

knife," and "fought" with her siblings. A. 336-37.

The government's appeal brief also selectively and misleadingly quotes parts of

unrelated district court proceedings that are completely irrelevant to the appeal, with

the apparent goal of suggesting that the court made other erroneous decisions. For

example, the government asserts that Judge Morrison "*sua sponte*" addressed Doe's

guardian ad litem's payment, and suggests Judge Morrison discouraged the guardian

ad litem from speaking to Doe. Gov. Br. 8 & 8, n.5. This is wrong. A full review of

this transcript shows an utterly unremarkable discussion between the court and the

guardian ad litem about the mechanics of payment.[4] This discussion has nothing to do

with any matter before this Court.

---

[4] As the court explained, although it was originally anticipated that the guardian would be paid
through CJA funds, the court had subsequently learned that payment had to be "approved specially"
in the "Administrative Office of the U.S. Courts." SA 524. The court explained that it had "every
confidence that it will happen, but I just want you to know that because I don't have pre-approval
and there's no set fund for it." SA 524. The court said, as "we are getting closer to trial and you're
thinking about the time you spend with [Doe] verses the time that maybe others she trusts in the

25

Similarly, the government also discusses Mr. Johnston's release on bail and modification of that release. Gov. Br. 9-11. This too is irrelevant to any matter on appeal. In any event, the government didn't appeal the court's decision to release Mr. Johnston on bail and Mr. Johnston has had no pretrial violations in the over two and a half years that he has been released on bail.[5]

The government makes no attempt to explain why it included either of these irrelevant matters, to which it devotes the same number of pages as it uses to discuss the *Daubert* testimony that is the subject of this appeal. *Compare* Gov. Br. 8-11 (discussion of facts related to the guardian ad litem and bail) to 22-25 (discussion of facts from the *Daubert* hearing).

---

U.S. Attorney's Office or in the FBI or CID spend time with [Doe]…I will leave it in your discretion to do whatever you need to do, but just know that, ultimately, I only have limited authority to get you paid in the end." SA 525. The court assured the guardian ad litem, however, that it would do "whatever [it could] with the judicial stamp…" SA 525.

[5] Although the government didn't appeal Mr. Johnston's release and never subsequently argued his release should be revoked, the government took the extremely unusual approach of filing a mandamus petition to this Court when the district court modified Mr. Johnston's bond to allow him to change his address and move from New York to Oklahoma. ECF No 23-1277, Dkt. 3. As Mr. Johnston's response to that mandamus petition indicated, the government's position was moot as the district court had already indicated that it would hear the government's motion to modify Mr. Johnston's address. ECF 23-1277, Dkt. 37. The government agreed, withdrew its mandamus petition, ECF 23-1277, Dkt. 43, and Mr. Johnston's bail was continued without issue.

## Summary of Argument

DNA testing in Mr. Johnston's case was unusual. The DNA samples were taken from a communal family comforter used regularly by six biological relatives; the government's own expert admitted that her lab didn't have a validated procedure for working with DNA mixtures of biological relatives; and the lab didn't use the STRmix computer program designed for mixtures of biological relatives. Moreover, the government further hindered the analyst's complex work by not providing necessary information, failing to provide requested DNA samples from all six biological relatives and failing to tell the analyst that the Johnstons' two youngest biological children also slept in the bed.

The district court's well-reasoned decision excluding this evidence in these unique circumstances was far from an abuse of discretion. First, as the government's own expert testified, the lab lacked any validated capability to determine likelihood ratios for DNA mixtures involving biological relatives and without a likelihood ratio, the DNA results lacked meaning. Second, the lab lacked a reliable method to determine the number of contributors to DNA mixtures involving biological relatives, and without a reliable calculation of the number of contributors, it wasn't known if DNA from additional biological children was included. And third, given that the defense and the government agreed that Mr. Johnston, his wife Monica, and their daughter Doe all used the communal family comforter, the probability that DNA

from Mr. Johnston, Monica, and Doe was on that comforter compared to a probability that a stranger's DNA was on it was irrelevant to any disputed fact. The district court's independent rulings under *Daubert* and Rules 401 and 403 were each well within its broad discretion.

In arguing to the contrary, the government misrepresents the facts and ignores testimony from its own experts that support the district court's decision. The government's brief collects a grab-bag of purported errors, seizing on ancillary points, but fails to undercut the reasoning of the court's central conclusions.

This Court should affirm.

## Standard of Review

The "trial court's decision to admit expert testimony and the method by which the court reaches that decision are reviewable only for abuse of discretion." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (upholding district court's ruling on DNA evidence after an "exhaustive[ ]" *Daubert* hearing). "Discretion in this context is broad and will be found to have been abused only when the decision to admit or exclude expert scientific testimony was 'manifestly erroneous.'" *Id.* at 162.

The district court has "broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case," *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002), and has "'considerable leeway' in determining whether to admit expert testimony." *United States v. Cantoni*,

No. 19-4358-CR, 2022 WL 211211, at *1 (2d Cir. Jan. 25, 2022) (upholding court's exclusion of expert testimony) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). *See also United States v. Green*, No. 22-3217, 2024 WL 4488577, at *2 (2d Cir. Oct. 15, 2024) (affording district court "substantial leeway").

This Court reviews evidentiary rulings under Fed. R. Evid. 401 and 403 for abuse of discretion. *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006). To "find such abuse, [this Court] must conclude that the trial judge's evidentiary rulings were arbitrary and irrational." *Id.* (quotation marks omitted).

## Argument

### Point I

**The district court acted within its broad discretion by excluding the DNA evidence from a communal family comforter used by six biological relatives, when the lab lacked a validated capability to evaluate DNA mixtures involving biological relatives and the government failed to provide the analyst key information.**

Six biological family members used the Johnston family comforter; four of them slept on it every night, and Doe used the comforter for leisure, to watch her tablet. Thus, DNA from all six Johnston family members was expected to be on the comforter. STRmix – a DNA testing software program – has a specific feature to use when testing DNA mixtures involving biological relatives, like the mixtures from the Johnston family comforter. The Army Lab that did the testing, however, didn't have the STRmix feature for biological relatives turned on. Thus, the government's analyst

couldn't calculate the probability that the DNA on the comforter included members of the Johnston family other than Mr. Johnston, Monica, and Doe, as those were the only three family members for which she ran the test. Instead, the analyst could only calculate the probability that the comforter had DNA from those three Johnstons versus the probability that a stranger's DNA was also included on the comforter. The probability that a stranger's DNA was on the comforter was irrelevant to the case.

Additionally, while the government's analyst *could* have addressed her lab's software limitations by "conditioning" – meaning using reference DNA samples from the Johnston family, she was also unable use this technique because the government failed to give her samples from three Johnston family members, including the two children who slept in the bed. The expert, thus, was doubly hamstrung: her lab lacked a reliable method to test DNA mixtures of biological relatives and she lacked the DNA reference samples necessary to work around her lab's software limitations.

In this context, the court acted well within its discretion by excluding this evidence as unreliable and irrelevant under Fed. R. Evid. 702 and *Daubert*.

I.    The district court must exclude expert testimony that isn't reliable and relevant.

The principal considerations for admitting expert testimony are whether the testimony is reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). The expert testimony not only must have a "reliable foundation," but also must "aid the jury in resolving a factual dispute," a "consideration [that] has been

aptly described…as one of 'fit.'" *Id.* at 591, 598. The trial judge is the "gatekeeper" and must exclude unreliable and irrelevant expert evidence. *Id.* at 597. The proponent of expert testimony – here the government – has the burden of establishing by a preponderance of the evidence that the admissibility requirements are satisfied. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Rule 702 of the Federal Rules of Evidence is the "primary locus" of the court's gatekeeping "obligation." *Daubert*, 509 U.S. at 589. That rule provides that: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific…knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The *Daubert* court also suggested other factors, "such as testing, peer review, error rates, and acceptability in the relevant scientific community," that "might prove helpful in determining the reliability of a particular scientific theory or technique." *Kumho Tire*, 526 U.S. at 141 (cleaned up). Those *Daubert* factors are "meant to be

31

helpful, not definitive" and the trial court retains the discretion to determine how to evaluate an expert's reliability on a case-by-case basis. *Id.* at 151-52. The overarching objective "is to ensure the reliability and relevancy of expert testimony." *Id.* at 152. *See also Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) (describing *Daubert* as requiring "exacting standards of reliability").[6]

II.     <u>Because of the limitations of the Army Lab in testing mixtures involving biological relatives and the government's failure to provide the analyst necessary facts, the evidence failed to meet the standards of Rule 702.</u>

Applying the principles of *Daubert* and Rule 702 here, Green's DNA analysis lacked reliable methods or sufficient facts. Her lab wasn't validated for and lacked the necessary software to calculate likelihood ratios for mixtures of biological relatives, meaning that she couldn't weigh the probability that other biological relatives were included in the mixtures. She lacked a reliable method to determine the number of contributors to DNA mixtures including biological relatives. And she lacked information about who regularly used the comforter and the reference DNA samples from three family members – pieces of information that she might have used to blunt the impact from her lab's testing limitations.

Because of these limitations, her analysis didn't meet any of the requirements of Rule 702. Green "lacked 'sufficient facts or data' to guide her testing and analysis,"

---

[6] While the government notes that the *Daubert* standard is "liberal," that is merely in comparison to the "more restrictive" previous *Frye* standard. Gov. Br. 32 (citing *Nimely v. New York*, 414 F.3d 381, 395 (2d Cir. 2005) and *Amorgianos*, 303 F. 3d at 267). The government fails to note that in both *Nimely* and *Amorgianos*, the expert evidence was excluded.

under 702(b), because she didn't have the reference samples, or accurate information about who used the comforter. Her DNA analysis in this case wasn't "the product of reliable principles and methods," as Green's lab lacked any validated method to test mixtures of biological relatives. Fed. R. Evid. 702(c) & (d).

Moreover, Green's analysis wasn't a good "fit" with the facts of the case, under Rule 702(a). As the Supreme Court has described it, "'[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591. *See also Kumho Tire*, 526 U.S. at 154-55 (upholding exclusion of evidence when the method wasn't generally unreliable, but was unreliable "to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*."). Because the parties agreed with the analyst's conclusion that it was many times more likely that Mr. Johnston, his wife, and Doe all had DNA on the comforter, rather than that a stranger's DNA was included, this testimony wouldn't "help the trier of fact to…determine a fact in issue." Fed. R. Evid. 702(a).

III. The court's detailed analysis of the 702 factors was not "manifestly erroneous."

As the district court reaffirmed, STRmix "enjoys broad acceptance in state and federal court." A. 1025-28. But this case wasn't about the general use of STRmix. Instead, the Army Lab lacked the feature of STRmix applicable to Mr. Johnston's case.

The court found that the testing here wasn't reliable because of two

33

fundamental limitations of the Army Lab: because it didn't validate or use the STRmix feature for related people, it lacked the ability to calculate likelihood ratios for related people, A. 1023-34, and it lacked a reliable method to calculate the number of contributors to mixtures of related people. A. 1034-49. Both of these gaps in the lab's capabilities were problematic: without the likelihood ratio, DNA results have "zero significance." A. 1025. *See also* A. 368. Similarly, the analysts' determination of the number of contributors to a DNA mixture is a "foundational part of every calculation." A. 1034 (citing *United States v. Williams*, 382 F. Supp. 3d 928, 937 (N.D. Cal. 2019)). If "that input is in doubt, the reliability of the entire analysis is necessarily in doubt." *Id.*

The district court's factual conclusions were amply supported by the testimony of the government's two experts. Green testified that the Army Lab "does not calculate relatedness likelihood ratios" because it has no "validated" "protocol" to do so. A. 460. Green, therefore, "didn't have the capability" of taking the "biological relationships" "into account," and her likelihood ratio calculations "never took relatedness into consideration at all." A. 460-64. Additionally, when calculating the number of contributors to the mixtures, Green lacked DNA reference samples for three family members, and lacked the information that two of those missing family members slept with the same comforter she was testing every night. She testified that her testing and results were necessarily "limited by the references [she] received." A.

34

515.

The court's legal conclusions were also correct. As it explained, "[w]hen a DNA analyst is asked to testify about DNA results or statistical propositions that exceed the bounds of her laboratory's then-existing validation, courts have appropriately exercised their gatekeeping function to exclude it." A. 1026 (citing *United States v. Ortiz*, 736 F. Supp. 3d 895, 901 (S.D. Cal. 2024)). This conclusion is supported by case law. For example, in *United States v. Williams*, the court excluded DNA evidence because the specific lab lacked the necessary software for the type of DNA tested in that case. 382 F. Supp. 3d at 937 (explaining that the software was "only validated to analyze complex mixtures of up to four contributors, and [the analyst] did not reliably conclude that only four people contributed DNA to this mixture").

Similarly, in *United States v. Russell*, the Ninth Circuit reversed when the district court permitted DNA testimony without making a reliability determination based on the "application" of STRmix to the specific facts. No. 22-50056, 2024 WL 4054382, at *2 (9th Cir. Sept. 5, 2024) (instructing the court to consider on remand, "how the number of assumed contributors… can affect the reliability of probabilistic genotyping for complex samples"). *See also United States v. Lewis*, 442 F. Supp. 3d 1122, 1160 (D. Minn. 2020) (granting in part the defense motion to exclude DNA evidence, holding that, based on the facts in that case, the government hadn't shown that

35

STRmix was reliable to "exclude a contributor" based on "low percentages" of DNA contributed).

Moreover, as in this case, in *Ortiz*, the court excluded DNA evidence because the government failed to prove the testing was reliable in part because of the "heightened" risks of errors where "the sample may have contained DNA from related individuals." 736 F. Supp. 3d at 901-02. Like in Mr. Johnston's case, the *Ortiz* analyst also wasn't told crucial information about the "potential for related contributors" to the DNA. *Id.* at 903-04.

In contrast, in cases where DNA evidence is correctly admitted, courts have noted favorably that the DNA processes used were validated by the specific labs. For example, in *United States v. Gissantaner*, relied on by the government, Gov. Br. 34-36, the "laboratory's internal validation [ ] included samples like the one in this case in which a minor contributor donated a small amount of DNA." 990 F.3d 457, 467 (6th Cir. 2021). The same is true in *Jones* and *Green*. *Jones*, 965 F.3d at 159 (noting that the district court "found persuasive the external validation and peer review" that type of DNA testing had undergone); *Green*, 2024 WL 4488577, at *2 (upholding denial of challenge to STRmix when "analyst followed the lab protocol"). *Lewis*, 442 F. Supp. 3d at 1145-50 (discussing internal validation at length).

The government has pointed to no cases admitting DNA evidence where the specific lab – like the Army Lab here – lacked a validated method to test the evidence

specific to the case. Instead, it cites just one district court opinion and one summary order from this Court, in support of its assertion that "[n]umerous courts have also admitted STRmix evidence over challenges concerning the subjectivity of an analyst's [number of contributors] calculation." Gov. Br. 36 (citing *Lewis*, 442 F. Supp. 3d at 1126 and *Green*, 2024 WL 4488577 (noting that the defense didn't argue that the number of contributors to the mixture was "material" under the facts of that case)). Neither case raises the issue presented here about mixtures involving biological relatives.

The district court also correctly found that the evidence failed to meet the standard of Rule 702(a). The court explained that "the sole purpose of calculating a likelihood ratio using STRmix is to assess the relative probabilities that one or more *competing hypotheses* about the contributor(s) to a DNA sample are true." A. 1027. Here, no party suggested that the "competing hypotheses" tested – that Doe's or Mr. Johnston's DNA wasn't on the comforter, or that a stranger's DNA was on the comforter – were true. Green's expert conclusion, therefore, didn't address any "fact in issue."

Moreover, that Green needed to test a relevant hypothesis when calculating the likelihood ratio was uncontroversial. The developers of STRmix have explained that "it is necessary for the forensic scientist to consider [their] observations in the light of…relevant case information…In a criminal trial, the propositions will represent the

positions of the prosecution and the defense, respectively." A 1028 (citing J. Buckleton et al., *Helping Formulate Propositions in Forensic DNA Analysis*, 54 Sci. & Just. 258 (2014)).[7] Kalafut agreed, explaining that for the "likelihood ratio to have meaning, the relevant information in the case needs to be considered" and the "defense should be entitled to all alternatives consistent with exoneration" that can be "appl[ied] to the software." A. 836-37.

Despite Kalafut's testimony, the government makes a half-hearted argument that "fit" isn't relevant to Mr. Johnston's case. Gov. Br. 31 (citing *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) ("fit inquiry in the case of fingerprint identification is not a significant factor, because identity evidence is the archetypal relevant evidence in criminal cases.")). But the government never fleshes out this argument, and *Mitchell* is inapposite: Mr. Johnston's case isn't a who-done-it. It isn't about identity. No one disputes that Mr. Johnston's DNA was on his bed. The dispute is about whether any assault happened.

Based on this record, and the specific limitations in the Army Lab, the district court was within its discretion to exclude the evidence.

---

[7] Notably, Ted Hunt, an FBI Senior Scientist and Senior Policy Advisor, has written a research paper describing this problem, explaining that the DNA propositions must relate to "contested issues" and compare "competing propositions that represent the positions of the parties." Ted Hunt, *Activity Level Testimony in U.S. Courts: A Legal Problem*, U. KAN. L. REV., Volume 74 (forthcoming 2025), available at https://ssrn.com/abstract=5233773.

38

## Point II

**The government's contrary argument, which relies on crucial factual errors and omissions, fails to demonstrate that the district court manifestly erred in excluding DNA evidence when the lab's testing ability was limited and the analyst lacked critical facts.**

The district court reached a narrow conclusion based on the specific lab's limited capabilities in testing DNA of biological relatives combined with the unusual fact in this case that the item tested was a communal comforter used by six biological relatives. Rather than squarely rebutting any of the court's factual or legal findings on that point, the government instead discusses the general reliability of STRmix at length. Gov. Br. 34-40. The general validity of STRmix is not in dispute, as the district court made clear. A. 1026.

The government also argues that *if* the court had made sweeping conclusions, those would be error. For example, the government says that "it would be manifest error to conclude that any time a forensic biologist does not run the defense's preferred hypothesis at the time of analysis, the hypotheses she ran will not aid the jury." Gov. Br. 58-59. Similarly, the government faults the district court for failing "to cite[ ] any precedent requiring a perfect match between [Mr.] Johnston's hypothesis at trial and the analyst's testing…" Gov. Br. 60. Tellingly, the government cites no portion of the court's decision in making either claim. That is because the court simply didn't make these sweeping conclusions.

39

The government's response fails to point to any manifest errors in the district court's decision.

I.   The government's brief relies on misleading presentations of the facts and material factual omissions.

The government repeatedly, inaccurately, asserts that DNA from Doe was "mixed with [Mr.] Johnston's semen." Gov. Br. 1, 4 ("semen…were mixed with his wife and [Doe's] DNA"); 11 (Mr. Johnston's semen "mixed with Doe's DNA"); 28 ("DNA from [Mr.] Johnston, Monica, and Doe [was] recovered from six semen stains"); 28 ("Doe's DNA came to be mixed with [Mr.] Johnston's semen"); 63 ("Evidence of Doe's DNA mixed with [Mr.] Johnston's semen"). These assertions are incorrect. On the contrary, Green testified that she couldn't say "when the DNA got" onto the comforter, or whether different people's DNA was put on the comforter at the "same time" or "separately." A. 496. She added that the "actual activity of how it got onto the comforter is not anything [she] could tell." A. 496. Thus, there was no testimony that Doe's DNA and Mr. Johnston's DNA got on the bed at the same time or was mixed together.

The government also barely mentions three crucial facts that undercut their arguments:

- The government only mentions that it didn't provide the requested DNA reference samples from all six people in the Johnston household when complaining that the court relied on this failure. Gov. Br. 26, 48. Elsewhere the government misleadingly asserts that "per best practices,

Green compared the [DNA] evidence to the reference[ ] [DNA samples],” because “[c]onditioning” using reference samples is a “best practice.” Gov. Br. 19-20. It fails to note that Green couldn’t fully use this “best practice” as she didn’t have the relevant samples.

- The government never mentions that Doe used the bed to watch her tablet. Instead, it misleadingly asserts that Doe “did not frequently spend time in” the bed. Gov. Br. 25, 65. Although the government cites SA 537 for this proposition, SA 537 doesn’t state that Doe “did not frequently spend time in” the bed.

- The government never mentions that it didn’t tell the analyst that Doe spent leisure time on the bed, that her two siblings slept in the bed every night, or that one of those siblings wet the bed.

These omissions from their brief are glaring. The district court carefully and correctly took account of all these factors, and the government fails to engage with the court’s reasoning.

Additionally, the government glosses over the complexities of the DNA testing here. It barely discusses Kalafut’s testimony, which it fails to mention in its lengthy discussion of DNA best practices. Gov. Br. 11-22. It omits his testimony describing “judgment calls” and “uncertainty,” including that stain 7 had some “uncertainly” about whether a fourth person’s DNA was included and that stain 20 was missing some of Mr. Johnston’s alleles. A. 827-28. And the government’s actual discussion of Kalafut’s testimony is misleading: it states that he didn’t “conclude” there was “an additional donor” in stain 23, Gov. Br. 24, while failing to mention his testimony that a “masked’ biological child was “most likely” in this stain. A. 748. It also states that Kalafut “testified” that the defense “reliance upon his work [on error rates in mixtures

41

of biological relatives] was 'unfounded,'" Gov. Br. 24, ignoring that Kalafut admitted later in his testimony that Mr. Johnston's case was similar to his work and did include a higher risk of error because of the numerous biological relatives involved. A. 787.

The government similarly omits discussion of Green's testimony about the limits of her results. It asserts that "Green could discern whether Doe's younger half-siblings' DNA were in Johnston's semen stains, and she concluded they were not." Gov. Br. 50, (citing A. 537-38, 566, 579). But it fails to note that Green only "tested the hypothesis that [she] had the capabilities to test," A. 462, which didn't include considering the probability other biological relatives were included. Relatedly, it asserts that the "mathematical output generated by STRmix [ ] indicated that Green was correct in her initial estimation of [the number of contributors]," Gov. Br. 22, but fails to mention that Kalafut explained that STRmix would still appear to work if biological relatives were masked. A. 821.

Once the government's brief is stripped of these misleading facts and the omitted facts are considered, its arguments fall apart.

II.     The government points to no material factual errors in the district court's analysis, no less "manifest" errors.

In addition to the government's factual misstatements and omissions, the government's asserted errors ignore the facts of Mr. Johnston's case and, instead, pick on minor aspects of the district court's exhaustive 87-page opinion. None of them undermine the court's ultimate conclusion that the testimony was unreliable.

42

1.  *The Army Lab didn't have a validated procedure for biological relatives.*

The government asserts that the Army Lab's "validated and audited policies ensured that testing and reporting was reliable here." Gov. Br. 48. The government's discussion, however, is about the lab's policies in general. Gov. Br. 48-49 (citing A. 286). With respect to biological relatives, the government cites only half of the lab's protocol and claims that the "clear import of [the lab's] policy is to *permit* reporting where mixtures involving biological relatives *can* be deduced into individual contributors, as was done here." Gov. Br. 49-50. Contrary to this claim, there was no testimony that the mixtures were "deduced" here. Indeed, the concept of a mixture being "deduced" wasn't discussed or defined at the hearing. Additionally, the omitted portion of the lab's protocol states that, depending on the case information, "no statistical weight may be available or reportable…" A. 680. As Green explained it, "when you have a mixture that could involve a biological relative, you should interpret and report with caution," and that the protocol "specifically advises that it may not be possible to report a statistical weight for a comparison where biological relatives are involved." A. 567.

The government also asserts that it is "irrelevant" that the lab "was not validated to 'distinguish biological relatives using STRmix" because "that was not the investigative question presented." Gov. Br. 50, *see also* Gov. Br. 20, 61. In support, it quotes a hearing exhibit about the lab's protocol for "differential extraction," stating

43

that in sexual assault cases generally, the "investigative question…is whether or not the victim's DNA profile is present in a semen stain from the subject." Gov. Br. 20, 61 (citing A. 690). This generality about sexual assault cases, where the analyst wouldn't expect the complainant's DNA on the tested item unless a sexual assault occurred, has no applicability here, where it was expected that Doe's DNA would be on the comforter that she used in her own home. In any event, Green didn't discuss "investigative questions" in her testimony or how that phrase might relate to Mr. Johnston's case.

Relatedly, the government claims that Green tested what it calls an "innocence" hypothesis, Gov. Br. 61, in considering the likelihood that the mixture included an "unknown, unrelated person," instead of Mr. Johnston. A. 462. But, given that it was Mr. Johnston's own comforter, the hypothesis that the DNA mixture included a stranger instead of Mr. Johnston was meaningless. While the government now complains that "Green had no way of knowing what alternative hypotheses the defense would seek to run," that is because the government failed to provide Green the relevant case information about who used the comforter. Gov. Br. 60. Green was instead left with "case information [that was] is incomplete or one-sided," which, as Kalafut explains, has "a trickle-down effect." A. 784.

44

2. *There is no record support for the government's assertion that the analysis wasn't "complex."*

The government also argues the court erred in calling the testing complex. Gov. 45-47. This argument is factually wrong, as the government's own expert explained that DNA testing is "certainly more complex with biological relatives," A. 569, and irrelevant to the fact that the Army Lab lacked any validated capability to test mixtures including biological relatives.

In support of this argument about complexity, the government points to irrelevant facts, saying there was an "ample" quantity of DNA and that Monica had "eight unique alleles" from Mr. Johnston and Doe. Gov. Br. 45-47. Based solely on these two irrelevant facts, the government makes a sweeping claim, stating that the fact that "there were other children who could have *hypothetically* contributed to the mixtures does not so alter the landscape of this evidence given the reality of the data and the testing conducted." Gov. Br. 47. In support, it cites *Lewis* – a case that didn't involve relatives and admitted some DNA testimony, and *Ortiz* – a case that did involve biological relatives and excluded DNA testimony. Gov. Br. 47. The government fails to explain how those cases support its argument and it fails to distinguish *Ortiz*, which only bolsters the district court's decision.

3. *It was appropriate for the court to discuss error rates as one factor of many.*

The government next states that the "court's comparison to studies involving different factual scenarios is uncompelling" and complains about individual studies

45

from a string cite in the court's short discussion about error rates. Gov. Br. 51. The government discusses one of these studies, which is mentioned in just three sentences in the court's 87-page opinion, at length. Gov. Br. 52-53 (citing A. 1037). It fails to clearly explain its complaint with this study, however, saying confusingly that the court "disregarded the labs [in the study] that did *not* render a false positive, and instead, did not calculate a NOC given 'possible relatedness' by using software, procedures, and refinements, as [the Army Lab] did here." Gov. Br. 52-53. Although it puts the phrase "possible relatedness" in quotation marks, this undefined phrase appears only once in the study, in a chart. A. 1081. Assuming that "possible relatedness" simply means the likelihood that biological relatives are in a mixture, however, the Army Lab didn't have validated software to assess those mixtures – on the contrary, as explained above, it lacked that STRmix feature.

In any event, contrary to the government's suggestion, the district court didn't rely on error rates "alone" in reaching its decision. Gov. Br. 53. Rather, the court considered error rates as one factor in its analysis, just as *Daubert* directs.

4. *The court accurately recounted Kalafut's testimony that a child was "most likely" "masked" in one stain and accurately discussed the government's failure to provide DNA samples so the analyst could properly "condition" her analysis.*

The government's next two purported errors aren't errors at all. First, it asserts the court "erroneously found that Kalafut had 'concluded that Green had, in fact, failed to recognize the presence of what Kalafut concluded was likely a fifth

contributor to at least one stain.'" Gov. Br. 54 (citing A. 987). Kalafut testified that the "most likely" explanation for stain 23 was that a biological child was "masked" in the stain, representing a fifth person's DNA in the mixture. A. 749. The district court, thus, accurately recounted Kalafut's testimony.

Second, it claims that the court "premised its ruling on its mistaken conclusion that it was inappropriate to assume the presence of Monica's DNA in the relevant stains" and that "[w]hether third parties spent time on the bed has no bearing on whether Monica's DNA was in fact in the stains…" Gov. Br. 56-57. The government provides no citation for these assertions, which are also wrong. The court actually said the contrary: that conditioning on Monica's DNA "may have been an entirely reasonable assumption for [Green] to make, given that the evidence was collected from the bed where Monica slept." A. 1048. No one disputed that Monica's DNA was on the comforter. The problem the court noted, however, was that Green was hampered by her inability to condition her analysis using DNA samples from the *other people* – in addition to Monica – who slept in the bed. As the court put it, Green "did not know that there were two *additional* family members who were also sleeping in that same bed every single night – each of whom shared 100% of their alleles with [Mr. Johnston] and Monica, and with whom [ ] Doe shared at least 25% of her own alleles." A. 1048.

III. <u>That the evidence was unreliable because the lab didn't have a reliable method to test DNA involving biological relatives couldn't be cured by cross-examination.</u>

Finally, the government argues that the district court erred in "fail[ing] to consider the effect of a limiting instruction or vigorous cross-examination." Gov. Br. 4, 33, 56 (citing *Kumho Tire*, 526 U.S. at 153; *Amorgianos*, 303 F.3d at 267; *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) (per curiam), and *Daubert*, 509 U.S. at 596). This argument also must be rejected.

"When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). In contrast, when the evidence doesn't meet that minimum threshold of relevancy, it can't be admitted. *Williams*, 382 F. Supp. 3d at 936. *See also Daubert*, 509 U.S. at 596.

Here, as explained in Point I, *supra*, the evidence didn't meet any minimum threshold of reliability or relevance. The testimony here wasn't "reliable, albeit debatable," *Amorgianos*, 303 F.3d at 267, or "shaky but admissible," *Daubert*, 509 U.S. at 596, it was unreliable and irrelevant based on the facts of the case. Testimony that isn't reliable isn't admissible. *Id.*

*Boucher* isn't to the contrary. In *Boucher*, one expert testified on three different topics: "widely accepted work-life [expectancy] tables," speculative projections about

48

future earnings, and speculative projections about future "fringe benefits." *Boucher*, 73 F.3d at 21-23. This Court found that only the first topic met the *Daubert* standard. *Id. See also In re Pfizer Inc. Sec. Litig.,* 819 F.3d 642, 665 (2d Cir. 2016) (the unreliable portion was "but one small part of an extensive economic analysis"). Unlike *Boucher*, where the expert testified about different topics, some of which were reliable, in Mr. Johnston's case, the expert planned to testify about one unreliable topic.

Just as in *Amorgianos* and *Kumho Tire*, the evidence was properly excluded.

### Point III

**The district court acted within its broad discretion by excluding the DNA evidence as irrelevant and unfairly prejudicial given that the parties agreed that it was more likely that DNA from Mr. Johnston, his wife Monica, and their daughter Jane Doe was on the communal family comforter than that DNA from a stranger was on their comforter.**

That DNA from Mr. Johnston, his wife Monica, and their daughter was on the family comforter wasn't disputed. All three people regularly used the comforter and it was expected their DNA would be there. It also wasn't disputed that semen would be on the bed that Mr. Johnston shared with his wife. The factual dispute between the parties was whether any sexual assault occurred and how and when the DNA got on the bed. But the government's own experts were clear that they couldn't opine on those questions.

49

Evidence is only relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence;" and "the fact is of consequence in determining the action." Fed. R. Evid. R. 401. The DNA evidence here was irrelevant because it didn't tend to make any fact of "consequence" "more or less probable." As the government's own expert testified, when the parties agree on whose DNA is on an item – like the comforter here – a likelihood ratio about whose DNA is on the item is just "not relevant." A. 843. The district court did not commit manifest error by accepting the testimony of the government's own witness.

In arguing otherwise, the government repeatedly mischaracterizes the evidence, asserting that "Doe's DNA [was] mixed with [Mr.] Johnston's semen," to claim that this "mix[ing]" was "highly probative of whether [he] sexually abused Doe." Gov. Br. 63. This is factually wrong. Green – the government's own expert – testified clearly that she could provide no information about when DNA was placed on the comforter and whether it was placed at the same time or separately. A. 496. She, thus, couldn't comment on whether the DNA was "mixed" in any way that would suggest that Doe's and Mr. Johnston's DNA was placed there at the same time.[8]

---

[8] Rather than accept that testimony, the government claims that the court "erroneously represented" that it was "*no more likely that the* DNA profiles seen in these stains were deposited through an act of sexual assault by Johnston against Doe…than through entirely innocent contact with the comforter by Doe and her parents on any number of other occasions..." Gov. Br. 69 (citing A. 975). The government claims the court's comment was "erroneous[ ]" because the experts didn't "opine[ ] on the likelihood of sexual assault." Gov. Br. 69. It isn't clear, however, what the government believes was factually wrong about the court's statement, which accurately reported the experts' testimony that they couldn't comment on how or when the DNA got on the comforter.

This argument is also illogical: Monica's DNA was also in all of the same spots as the semen, and DNA from Mr. Johnston and Doe. Under the government's reasoning, Monica's DNA would also be "mixed" with Doe's DNA and Mr. Johnston's semen and would thus show – under the government's view – that Monica was involved in any sexual abuse. This counter-factual is obviously not true – there is no such allegation – and highlights the fallacy in the government's reasoning.

As explained below, the government's other responses are similarly meritless.

I.    <u>The government's arguments about major and minor contributors being relevant to how DNA got on the bed are unsupported by the record.</u>

The government makes various assertions that weren't adopted by any expert related to "major" versus "minor" contributors to the stains being relevant to the activity that produced the DNA. Gov. Br. 66-70. The government suggests that a major DNA contribution is more likely from sex rather than from sleeping, playing, or anything else. Gov. Br. 68-69. It also claims it is "probative that the semen stains contained the DNA of the two sets of people who could have had intercourse on that bed" and "Doe was a major contributor" in stains in which Monica was a "minor contributor." Gov. Br. 66. The government provides no factual or record support for either claim, both of which must be rejected.

Next, the government declares that "Doe is the major contributor" to four of the stains "notwithstanding that semen contains a rich quantity of DNA," which

"undermines any argument that Doe's DNA was the result of transference or passing touch." Gov. Br. 69-70. These assertions are not only completely unsupported by the record, but are also illogical. No expert testified about any connection – or, if there is a connection, what that connection means – between semen being "rich" in DNA and a different person's DNA being a "major contributor." As the court correctly pointed out, if the government was right that the level of contribution indicated whether DNA was placed at the same time, then the "stark contrast between Doe's and Johnston's relative contributions would seem to suggest an entirely different time and manner of deposit." A. 1053-54. Moreover, "[t]ransference," which was barely mentioned at the hearing, was rendered irrelevant after the hearing when the government explained that "Doe had direct contact with the comforter on various occasions unrelated" to the allegations. A. 1054, n. 12.

The district court properly rejected these arguments as being contrary to the analysts' testimony and illogical. A. 1052-55.

II.    None of the government's hodgepodge of other arguments are persuasive.

The government asserts that the court "misapplied the law by requiring the government to disprove potential 'innocent' counter factual explanations" by citing to the court's questions during oral argument, and claims that the court "believed" the "government need[ed] to show that the DNA evidence by itself would prove [Mr.] Johnston's guilt beyond a reasonable doubt." Gov. Br. 67. Notably the government

cites to no portion of the district court's opinion in support of either assertion; the opinion simply doesn't say either of these things. [9] In any event, that Doe used the bed to watch her tablet is a *factual* explanation about why her DNA was likely on the comforter – it is not "counter factual," but undisputed.

The other arguments are also unpersuasive:

- That Mr. Johnston and Doe's DNA was likely on a comforter they both used isn't "res gestae," a claim the government never explains. Gov. Br. 43. "Res gestae" refers to the "events at issue, or other events contemporaneous with them." Black's Law Dictionary. 8th edition, p. 1335. DNA testing is not the "event[ ] at issue." In support, the government cites a case stating that it was "res gestae" that the victims were "dismember[ed]." Gov. Br. 43 (citing *United States v. Pepin*, 514 F.3d 193, 201 (2d Cir. 2008)). *Pepin* has no relationship to Mr. Johnston's case.

- That the government would like to "couple[ ]" the DNA with the "corroborative evidence" of Doe's "expect[ed]" testimony, Gov. Br. 65, doesn't make the evidence any less irrelevant.

- The government's plea to the Court to "[v]iew[ ] [the evidence] holistically" also doesn't change the analysis. In support, it asserts that the "DNA of children who spent 'innocent' time on the bed was not in Johnston's semen stains, whereas the DNA of Doe…was in the semen stains." Gov. Br. 65. This ignores both that Doe too spent "innocent" time on the bed and that the analyst didn't compare the likelihood that DNA from the other children who slept in the bed was on the comforter in addition to or instead of Doe's DNA.

- The government misleadingly says that "Doe is expected to testify that she infrequently spent time on her parents' bed outside the abuse…" Gov. Br. 65,

---

[9] Earlier in its brief, the government pulls quotes from four different pages of the district court's opinion to cobble together the misleading assertion that the court said that the DNA testing "does not prove the government's case and is equally likely to be explained by purely incidental or innocent contact as it is by sexual assault [so] it found Green's proffered testimony irrelevant." Gov. Br. 26 (citations omitted) (citing A. 984-85, 987, 1023).

while never mentioning – even once – that Doe did spend time on the bed, watching her tablet.

III.   <u>The government fails to meaningfully dispute the court's conclusion that this evidence was unfairly prejudicial.</u>

The court was also right to exclude this evidence as unfairly prejudicial, an independent basis to affirm. Presenting unsurprising DNA evidence – that DNA from three people who used a comforter was more likely on their comforter than that a stranger's DNA was on their comforter – as if it was a fact of consequence to Mr. Johnston's guilt or innocence would incorrectly suggest to the jury that the DNA evidence mattered. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.

Because of that risk, the district court "must make a conscientious assessment of whether unfair prejudice substantially outweighs probative value." *United States v. Al-Moayad*, 545 F.3d 139, 160 (2d Cir. 2008) (cleaned up); Fed. R. Evid. R. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). It did so here.

Moreover, the substantial risk of unfair prejudice here is highlighted by the fact that the government remains unable to accept the limitations of the DNA evidence in this case. For example, in its appellate brief, the government makes the startling assertion that the fact that Mr. Johnston's DNA was on his own comforter that he slept with every night is relevant because "a defendant's presence at a crime scene is relevant…even if there is an innocent explanation for it." Gov. Br. 68, n. 12. This assertion that Mr. Johnston's DNA likely being on his own comforter shows that he was present "at a crime scene" only underscores the prejudice this irrelevant evidence would cause – and the misleading use the government plans to make of it.

Allowing the government to twist an innocent, undisputed, irrelevant fact that Mr. Johnston's DNA is likely on his own comforter to argue that it tends to show his guilt would be unfairly prejudicial. That is especially true because DNA evidence in particular can have a "powerful effect on a jury's evaluation of a criminal case." *Williams*, 382 F. Supp. 3d at 938 (citing John W. Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability and Form*, 71 OR. L. REV. 349, 367 n.81 (1992) ("There is virtual unanimity among courts and commentators that evidence perceived by jurors to be 'scientific' in nature will have particularly persuasive effect.") (citing cases)). The district court permissibly took account of this factor in conducting the Rule 403 balancing.

## Conclusion

The Court should affirm the suppression order because the district court acted well within its broad discretion in excluding DNA evidence from an item used by six family members. In these unusual circumstances, the testing was unreliable because the lab lacked any program to test DNA from biological family members, the expert wasn't given DNA samples from the family members, and the government didn't tell the expert that all family members used the item. The results were also irrelevant: all the expert could say was that it was more likely three family members left DNA on the bed, than that a stranger was included – facts no one disputed. The court didn't err at all, much less err manifestly, in excluding this evidence.

Dated:       Brooklyn, New York
               November 24, 2025

                                Respectfully submitted,

                                FEDERAL DEFENDERS OF NEW YORK
                                APPEALS BUREAU
                                *Allegra Glashausser*
                                **Allegra Glashausser**
                                Assistant Federal Defender
                                52 Duane Street, 10th Floor
                                New York, New York 10007
                                Tel.: (212) 417-8739

## CERTIFICATE OF SERVICE

I certify that a copy of this brief has been served by **ACMS** on the United States Attorneys/E.D.N.Y.; Attention: **AMY BUSA, ESQ., and MARGARET SCHIERBERL, ESQ.**, Assistant United States Attorneys, 271 Cadman Plaza East, Brooklyn, NY 11201.

Dated:   New York, New York
            November 24, 2025

_____*Allegra Glashausser*_____
**ALLEGRA GLASHAUSSER**
Assistant Federal Defender

57

---

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitations of Local Rule 32.1(a) because:

> this brief contains 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a monospaced typeface using **Microsoft Word** with **14 characters per inch in Garamond** style.

Dated: Brooklyn, New York
November 24, 2025

*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**
Assistant Federal Defender