# 25-753-cr

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellant*,

---v.---

TYLER SCOTT JOHNSTON,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF OF 41 SCHOLARS OF EVIDENCE AND FORENSIC SCIENCE AS
*AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE AND
AFFIRMANCE OF THE DISTRICT COURT'S DECISION**

Katherine Judson

CENTER FOR INTEGRITY IN FORENSIC
  SCIENCES
Madison, WI 53703
(608) 736-2437
kate@cifsjustice.org

*Counsel for Amicus Curiae*

Maneka Sinha
  *Counsel of Record*

FORENSIC DEFENSE CLINIC
NEW YORK UNIVERSITY SCHOOL OF
  LAW
New York, NY 10012
(212) 998-6610
maneka.sinha@nyu.edu

*Counsel for Amicus Curiae*

*List of Amicus Curiae*

All individuals listed are signing on in their individual capacity and do not reflect institutional viewpoints. Institutional information is included for identification purposes only.

**Anna Arons**
Associate Professor of Law
St. John's University School of Law

**Nila Bala**
Acting Professor of Law
UC Davis School of Law

**Valena Beety**
Robert H. McKinney Professor of Law
Indiana University Maurer School of Law

**Donald Braman**
Associate Professor
George Washington University Law School

**Daniel J. Capra**
Reed Professor of Law
Fordham Law School

**Nina Chernoff**
Professor of Law
City University of New York School of Law

**Amanda David**
Assistant Professor of Law
City University of New York School of Law

**M. Bonner Denton**
Professor of Chemistry and Biochemistry
University of Arizona

**Rochelle Dreyfus**
Pauline Newman Professor of Law Emerita
New York University School of Law

**David L. Faigman**
Chancellor & Dean and John F. Digardi Distinguished Professor of Law
UC Law San Francisco

**Keith A. Findley**
Emeritus Professor
University of Wisconsin Law School

**Brandon Garrett**
David W. Ichel Distinguished Professor of Law
Duke University School of Law

**Megan Graham**
Clinical Associate Professor
University of Iowa College of Law

**Richard E. Gutierrez**
Assistant Professor of Law
University of Illinois Chicago (UIC)
School of Law

**Eve Hanan**
Professor of Law
UNLV Boyd School of Law

**Daniel Harawa**
Professor of Law
New York University School of Law

**Aliza B. Kaplan**
Professor of Law
Lewis & Clark Law School

**Rachel Kincaid**
Associate Professor of Law
Baylor Law School

**Jason Kreag**
Interim Dean and Professor of Law
University of Arizona James E.
Rogers College of Law

**Jeff Kukucka, Ph.D.**
Professor of Psychology
Towson University

**Christopher Lau**
Clinical Associate Professor & Co-
Director
Wisconsin Innocence Project,
University of Wisconsin Law School

**Carlotta Lepingwell**
Director, Criminal Justice Clinic
Tulane Law School

**Cortney Lollar**
Professor of Law
Georgia State University College of
Law

**Christopher McKee**
Adjunct Professor of Law
University of Colorado School of Law

**Colin Miller**
Professor of Law
University of South Carolina Joseph
F. Rice School of Law

**Erin Murphy**
Norman Dorsen Professor of Civil
Liberties
New York University School of Law

**Ieshaah Murphy**
Assistant Professor of Law
Howard University School of Law

**G. Alexander Nunn**
Associate Professor of Law
Texas A&M University School of
Law

**M. Katherine Philpott**
Affiliate Assistant Professor
Department of Forensic Science
Virginia Commonwealth University

**Janis C. Puracal**
Executive Director
Forensic Justice Project

**Natalie Ram**
Professor of Law
University of Maryland Francis King
Carey School of Law

**Andrea Roth**
Professor of Law and Barry Tarlow
Chancellor's Chair in Criminal Justice
UC Berkeley Law

**Nathan Ellis Rouse**
Assistant Professor of Law
University of South Carolina Joseph
F. Rice School of Law

**Katharine Skolnick**
Assistant Professor of Law
Elisabeth Haub School of Law at Pace
University

**Vincent Southerland**
Associate Professor of Law
New York University School of Law

**Colin Starger**
Professor of Law
University of Baltimore

**Katherine Jo Strandburg**
Pauline Newman Professor of Law
New York University School of Law

**Sonia Suter**
Professor of Law and Kahan Family
Research Professor
George Washington University Law
School

**Imran J. Syed**
Clinical Professor of Law
University of Michigan Law School

**Lisa Waters**
Assistant Professor of Law
City University of New York School
of Law

**Kate Weisburd**
Professor of Law
UC Law San Francisco

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

INTEREST OF AMICI CURIAE ................................................................... 1

SUMMARY OF ARGUMENT ..................................................................... 3

SCIENTIFIC BACKGROUND .................................................................... 7

  Ensuring Scientific Reliability Requires Representative Internal Validation ....... 8

  DNA Basics ........................................................................................ 10

  Determining NOC in DNA Mixtures Presents Challenges ................................. 11

  Mixtures Containing Relatives Are Difficult to Analyze ................................... 13

  PGS Systems Retain Elements of Subjectivity .............................................. 16

ARGUMENT .......................................................................................... 17

  I.  Representative internal validation testing is required for boundary-pushing PGS applications ............................................................................... 17

    A. Rule 702(d) requires representative internal validation testing ................... 17

    B. The samples at issue are highly complex mixtures of DNA from multiple relatives that push the bounds of PGS use. ....................................... 20

  II. Because USACIL never internally validated STRmix's ability to distinguish between biological relatives, Appellant's proffered evidence fails Rule 702(d)'s reliability test. .................................................................... 23

  III. Appellant's proffered evidence also fails Rule 702(d)'s reliability test because Appellant has not separately demonstrated that USACIL was internally validated to perform NOC determinations on samples containing relatives. . 28

  IV. Appellant's proffered evidence additionally fails Rule 702(d)'s reliability test because the NOC of these samples likely exceeded USACIL's four-person internal validation limit ................................................................. 31

i

CONCLUSION .................................................................................34

CERTIFICATE OF COMPLIANCE .......................................................35

CERTIFICATE OF SERVICE..............................................................36

TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ................................. 3, 7, 24, 29

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........ 1, 4, 5, 17

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ............................................................ 4

*People v. Hillary*, Index No. 2015-15 (N.Y. Cty. Ct. Aug. 26, 2016) ..................... 27

*People v. Thompson,* 2019 NY Slip Op 51521(U) (N.Y. Sup. Ct. 2019) ............... 32

*United States v. Ferguson,* No. 23-cr-203 (SRN/TNL), 2024 U.S. Dist. LEXIS
     80118 (D. Minn. May 2, 2024) ............................................................... 27

*United States v. Gissantaner*, 990 F.3d 457 (6th Cir. 2021) ............................. 18, 19

*United States v. Jones*, 965 F.3d 149 (2d Cir. 2020) ................................................ 18

*United States v. Lewis*, 442 F.Supp.3d 1122 (D. Minn. 2020) ................................ 28

*United States v. Lopez*, No. 3:20-cr-95 (VAB), 2025 U.S. Dist. LEXIS 71304 (D.
     Conn. Apr. 15, 2025) .............................................................................. 28

*United States v. McCluskey*, 954 F.Supp.2d 1224 (D. N.M. 2013) ............... 5, 18, 26

*United States v. Morgan*, 53 F.Supp.3d 732 (S.D.N.Y. 2014) ........................... 19, 28

*United States v. Ortiz*, 736 F.Supp.3d 895 (S.D. Cal. 2024) ........................... *passim*

*United States v. Patterson*, 288 F.App'x 752 (2d Cir. 2008) .................................. 18

*United States v. Russell*, No. 22-50056, 2024 U.S. App. LEXIS 22562, (9th Cir.
     Sept. 5, 2024) .......................................................................... 19, 27, 31

*United States v. Tucker*, No. 18-CR-119 (SJ), 2020 U.S. Dist. LEXIS (E.D.N.Y.
     Jan. 8, 2020) ........................................................................................ 19

iii

*United States v. Williams*, 382 F.Supp.3d 928 (N.D. Cal. 2019)..............5, 19, 28, 32

**Other Authorities**

*% Exonerations by Contributing Factor*, National Registry of Exonerations, https://exonerationregistry.org/exonerations-contributing-factor .........................1

Am. Acad. Forensic Sci. Standards Board, *ANSI/ASB Standard 018: Standard for Validation of Probabilistic Genotyping Systems* (1st ed. 2020)............................9

Am. Acad. Forensic Sci. Standards Board, *ANSI/ASB Standard 020: Standard for Validation Studies of DNA Mixtures, and Development and Verification of a Laboratory's Mixture Interpretation Protocol* (1st ed. 2018) ......................*passim*

Corina C.G. Benschop et al., *An Assessment of the Performance of the Probabilistic Genotyping Software EuroForMix: Trends in Likelihood Ratios and Analysis of Type I & II Errors*, 42 Forensic Sci. Int'l: Genetics 31 (2019) .........15

Expert Working Group on Human Factors in DNA Interpretation, *Forensic DNA Interpretation and Human Factors: Improving Practice Through a Systems Approach* (2024) ...............................................................................21

Fed. Bureau Investigation, *Quality Assurance Standards for Forensic DNA Laboratories* (2011) ...............................................................................9

John M. Butler et al., *DNA Mixture Interpretation: A NIST Scientific Foundation Review* (2024) ...........................................................................*passim*

John M. Butler, *Advanced Topics in Forensic DNA Typing: Interpretation* (2015) ...........................................................................21, 25, 28

John M. Butler, *Fundamentals of Forensic DNA Typing* (2010).....................*passim*

John M. Butler, *Summarized Info. From Publicly Accessible Validation Studies, Proficiency Testing Results, and Interlaboratory Comparison Data* (2024).......23

Josh Lieberman et al., *Gold Versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Forensic Evidence?*, 14 Psych. Pub. Pol. and L. 27 (2008)...................................................1

iv

Katherine Kwong, *The Algorithm Says You Did It: The Use of Black Box Algorithms to Analyze Complex DNA Evidence*, 31 Harv. J. L. & Tech. 275 (2017)............................................................................................2

Meng-Han Lin et al., *The Interpretation of Mixed DNA Profiles From a Mother, Father, and Child Trio*, 44 Forensic Sci. Int'l: Genetics 102175 (2020).............30

Paul C. Giannelli, *Forensic Science:* Daubert's *Failure*, 59 Case W. Res. L. Rev. 869 (2018)............................................................................................4

President's Council of Advisors on Sci. and Tech., Exec. Office of the President, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016) ........................................................*passim*

R. Austin Hicklin et al., *Variation in Assessments of Suitability and Number of Contributors for DNA Mixtures*, 65 Forensic Sci. Int'l: Genetics 102892 (2023) ............................................................................................12, 16, 29

Sci. Working Grp. on DNA Analysis Methods, *Guidelines for the Validation of Probabilistic Genotyping Systems* (2015)..........................................*passim*

Susan F. Petricevic et. al, *DNA Profiling of Trace DNA Recovered from Bedding*, 159 Forensic Sci. Int'l 21 (2006) ........................................................31

Tim Kalafut et al., *Investigation Into the Effect of Mixtures Comprising Related People on Non-Donor Likelihood Ratios, and Potential Practises to Mitigate Providing Misleading Opinions*, 59 Forensic Sci. Int'l: Genetics 102691 (2022) ............................................................................................*passim*

## Rules

Fed. R. Evid. 702............................................................................................4

Fed. R. Evid. 702 advisory committee's note to the 2023 amendment...................18

Fed. R. Evid. 702(d) ........................................................*passim*

INTEREST OF *AMICI CURIAE*[1,2]

*Amici Curiae* are scholars committed to the reliable and transparent use of forensic evidence. In the present case, *amici* are concerned with the faithful application of scientific principles, Federal Rule of Evidence 702 (Rule 702), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) to boundary-pushing uses of DNA analysis.

Due to its "mystical aura of definitiveness[,]" jurors struggle to "systematically evaluate the strength" of DNA evidence. Josh Lieberman et al., *Gold Versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Forensic Evidence?*, 14 Psych. Pub. Pol. and L. 27, 27, 58 (2008). This is troubling in light of the prevalent role that misleading forensic evidence has played in wrongful convictions. *See % Exonerations by Contributing Factor*, National Registry of Exonerations, https://exonerationregistry.org/exonerations-contributing-factor (last visited

---

[1] Counsel for both parties consent to the filing of this brief. Neither party's counsel authored this brief in whole or in part, and neither party nor party counsel contributed money intended to fund the preparation or submission of this brief. Only counsel for *amici curiae* contributed to the preparation and submission of this brief.

[2] This brief was authored by Kaitlin Ponder, Garrett Salzman, and Michela Weihl, students at NYU Law School, under the supervision of Maneka Sinha.

1

September 6, 2025) (approximately twenty-nine percent of exonerations since 1989 involved false or misleading forensic evidence).

Despite the reputation DNA analysis holds as the "gold standard" of forensic science, DNA analysis methods are not monolithic. Katherine Kwong, *The Algorithm Says You Did It: The Use of Black Box Algorithms to Analyze Complex DNA Evidence*, 31 Harv. J. L. & Tech. 275, 275–76 (2017). Technological advances have permitted analysis of increasingly complex DNA mixtures, leading to heightened risks of error and greater variation in reliability. *Id.*

The samples in this case have all the hallmarks of complexity that can push DNA analysis methods beyond their current reliability limits. These include the presence of biological relatives, the high number of potential contributors, and ambiguous mixture proportions.[3] John M. Butler et al., *DNA Mixture Interpretation: A NIST Scientific Foundation Review* 42–43 (2024) [hereinafter *NIST Mixture*]. Complex mixture analysis presents distinct risks: analysis can produce both false exclusion of true contributors and false inclusion of non-contributors. *Id.*, at 58–59; Tim Kalafut et al., *Investigation Into the Effect of Mixtures Comprising Related*

---

[3] These and other potential variables make up what scientists call a "factor space." *NIST Mixture*, *supra*, at 70. Internal validation data supports reliability where it covers the same factor space as tested samples. *Id.*

*People on Non-Donor Likelihood Ratios, and Potential Practises to Mitigate Providing Misleading Opinions*, 59 Forensic Sci. Int'l: Genetics 102691, 2 (2022).

For samples of this unique complexity, validation testing is central to ensuring reliable use. *NIST Mixture*, *supra*, at 70; President's Council of Advisors on Sci. and Tech., Exec. Office of the President, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* 81 (2016) [hereinafter *PCAST*]. *Amici* do not question the general reliability of STRmix, the software used in this case. Nor do they question the general competence of the United States Army Criminal Investigation Laboratory ("USACIL"), or the possibility that proper validation might permit the type of testing done here. Rather, *amici* argue that because USACIL has not done validation testing on samples of this kind and complexity, the DNA analysis here cannot be shown to be reliable.

To ensure fair trials and uphold the integrity of DNA analysis as it evolves, judicial oversight of the kind the District Court engaged in is required.

## SUMMARY OF ARGUMENT

Rule 702(d) requires scientific evidence, like the DNA evidence at issue here, to be reliably applied as a precondition of admissibility. Fed. R. Evid. 702(d). "To warrant admissibility, … an expert's analysis [must] be reliable at every step." *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002). The proponent—here,

Appellant—carries the burden of proving reliability by a preponderance of the evidence. Fed. R. Evid. 702.

Whether a method has been tested is a key factor in assessing scientific reliability. *Daubert*, 509 U.S. at 593; *see* Paul C. Giannelli, *Forensic Science:* Daubert's *Failure*, 59 Case W. Res. L. Rev. 869, 872 (2018) (explaining "the first and *most important* factor is empirical testing," because other *Daubert* factors are themselves dependent on testing) (emphasis in original). The mere existence of testing, however, is insufficient. To establish reliability, test data must be representative of the facts in a case. *See Daubert*, 509 U.S. at 591 ("[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes"); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (exclusion is warranted where there is "too great an analytical gap" between studies relied upon and an expert's testimony).

Internal validation plays a critical role in ensuring reliability as applied and, accordingly, admissibility of forensic evidence. Internal validation is the process by which a method is tested to ensure that it performs reliably as implemented by a particular laboratory. Sci. Working Grp. on DNA Analysis Methods, *Guidelines for the Validation of Probabilistic Genotyping Systems* § 4 (2015) [hereinafter *SWGDAM*]. Internal validation identifies the conditions under which a method

4

works as intended and, crucially, when a method no longer works reliably. *Id*.; *NIST Mixture, supra,* at 95. Where DNA analysis goes beyond the limits established through internal validation, the results of such analysis cannot be deemed reliable. *See United States v. Ortiz*, 736 F.Supp.3d 895, 908 (S.D. Cal. 2024) (excluding DNA evidence based on insufficient internal validation); *United States v. Williams*, 382 F.Supp.3d 928, 938 (N.D. Cal. 2019) (same); *United States v. McCluskey*, 954 F.Supp.2d 1224, 1280 (D. N.M. 2013) (same).

Accordingly, even a reliable scientific methodology cannot be reliably applied without robust and comprehensive internal validation testing. *See Daubert*, 509 U.S. at 593 (emphasizing testing as a critical factor for assessing reliability); *Ortiz*, 736 F.Supp.3d at 908 (excluding STRmix results under Rule 702(d) where analysis exceeded internal validation limits); *see also NIST Mixture*, *supra*, at 62 (validation of DNA software must include testing samples "similar in complexity to those seen in casework").

The samples in this case contain DNA from numerous related individuals who have overlapping genomic profiles. A:510.[4] High "number of contributors" ("NOC") and relatedness of those contributors each independently confound DNA

---

[4] All citations preceded by "A" refer to pages of Appellant's appendix to its brief to this Court.

analysis. *NIST Mixture*, *supra*, at 43. This is even more true when these characteristics are present together. *Id*.

Against this backdrop, USACIL's internal validation is deficient in three respects, each of which independently renders the DNA analysis unreliable as applied. First, USACIL did not internally validate STRmix's ability to analyze mixtures comprised of DNA from biological relatives. A:287. The samples in this case were collected from a comforter shared by the entire Johnston family, making distinguishing between biological relatives central to the analysis. A:510. The analysis must distinguish between DNA contributed by Tyler Scott Johnston ("Mr. Johnston"), Jane Doe ("Doe"),[5] and the four other members of the household, all of whom are biologically related to Mr. Johnston and/or Doe. A:463–64.

Second, Appellant failed to prove that USACIL was internally validated to calculate the NOC for samples containing relatives. Meaning, USACIL DNA analyst Sara Green's NOC assignments are inherently unreliable. NOC determination is an essential precursor to STRmix analysis. *NIST Mixture*, *supra*, at 51. This unreliable

---

[5] The District Court noted that Doe was identified as female at birth, but since the start of this case has begun to identify as male and use "he/him" pronouns. A:976. Because this change occurred after the start of the case, many documents in the record use "she/her" pronouns and refer to Doe as Monica's "daughter." *Id*. To avoid confusion and out of respect for Doe's preference, *amici* refer to Doe only by name.

step thus undermines the reliability of Appellant's DNA evidence as a whole. *See Amorgianos*, 303 F.3d at 267 (requiring reliability at every step of analysis).

Third, USACIL did not internally validate STRmix to analyze DNA mixtures containing more than four contributors. A:286. Several factors, however, suggest that the samples consist of at least five contributors. Accordingly, USACIL's use of STRmix exceeded the limits of internal validation here too.

For each of these reasons independently and cumulatively, Appellant's evidence stretched beyond the limitations of USACIL's internal validation testing, thus failing Rule 702(d)'s reliability test.

<u>SCIENTIFIC BACKGROUND</u>

DNA analysis has a well-deserved reputation as one of the most reliable forensic methods, when used under the right circumstances. *PCAST*, *supra*, at 2–3. Yet, DNA is not immune from the pitfalls present in all forms of forensic analysis. *See id*. at 7–13 (finding some methods of DNA analysis unreliable and noting that even generally reliable DNA analysis is subject to human error).

Early DNA methods were limited to simple applications and were, as a result, more reliable than more complicated modern applications. Early DNA applications required large quantities of DNA. *NIST Mixture*, *supra*, at 21. Interpretation methods were reliable primarily for analysis of single-source profiles (one contributor) or

simple mixtures (two contributors, both providing relatively large quantities of DNA). *PCAST*, *supra*, at 69.

Modern advances have introduced complexities that more frequently yield unreliable results. Technological developments have enabled analysis of a few cells' worth of DNA. *NIST Mixture*, *supra*, at 21. People constantly shed tiny amounts of DNA as they move about the world—any time a person touches an object, even briefly, they can transfer DNA, including other people's DNA, to that object. *Id.*, at 142. Consequently, today's samples are often complex mixtures, defined as mixtures containing three or more contributors or two contributors with additional complicating factors. *PCAST*, *supra*, at 75; John M. Butler, *Fundamentals of Forensic DNA Typing* 326 (2010) [hereinafter *DNA Fundamentals*]; *NIST Mixture*, *supra*, at 23. These mixtures are inherently challenging to interpret. *PCAST*, *supra*, at 75.

**Ensuring Scientific Reliability Requires Representative Internal Validation**

Ensuring reliable results requires laboratories to adhere to limits established by validation testing. *SWGDAM*, *supra*, at Introduction; Am. Acad. Forensic Sci. Standards Board, *ANSI/ASB Standard 020: Standard for Validation Studies of DNA Mixtures, and Development and Verification of a Laboratory's Mixture Interpretation Protocol*, § 4.3 (1st ed. 2018) [hereinafter *ANSI/ASB 020*]. Validation

8

is the "process by which a procedure is evaluated to determine its efficacy and reliability for forensic casework analysis." Fed. Bureau Investigation, *Quality Assurance Standards for Forensic DNA Laboratories*, § 2 (2011) [hereinafter *FBI QAS*].

Both "developmental" and "internal" validation are necessary to establish reliability. *Id.*; Am. Acad. Forensic Sci. Standards Board, *ANSI/ASB Standard 018: Standard for Validation of Probabilistic Genotyping Systems*, § 4.1.1 (1st ed. 2020) [hereinafter *ANSI/ASB 018*]. Developmental validation establishes the general functionality of a system. *SWGDAM*, *supra*, at § 3.

Internal validation defines the limits of a system as applied by an *individual* lab. *Id.* at § 4. Due to different policies, technologies, and methods among labs, internal validation is necessary to establish a laboratory's reliable application of a system, even when that system has been developmentally validated. *Id.*; *ANSI/ASB 020*, *supra*, at Annex B.

DNA analysis conducted beyond the limits of internal validation cannot be trusted to produce reliable results. *See ANSI/ASB 018*, *supra*, at Foreword (internal validation is necessary to "demonstrate the reliability of [a] software"); *see also FBI QAS*, *supra*, at § 8.3.2 ("[i]nternal validation shall define quality assurance parameters and interpretation guidelines"). All "variable[s] that impact[]

9

interpretation," such as those in complex mixtures, must be internally validated by a lab. *ANSI/ASB 020*, *supra*, at § 3.2, Annex B; *see SWGDAM*, *supra*, at § 4.1.6 (requiring that internal validation of mixture samples test a wide range of variables).

## DNA Basics

Analysis of DNA evidence involves isolating certain locations along the DNA sequence ("loci," or "locus" when singular) and identifying the alleles present at those loci. *DNA Fundamentals*, *supra*, at 25. Alleles utilized in forensics are short sequences of DNA ("short tandem repeats" or STRs) that repeat a certain number of times at a locus. *Id*., at 29. An allele labeled "11" means there are eleven repeats at that locus. *Id*.

Every person has two alleles per locus, one inherited from each biological parent. *Id.*, at 25. An individual may have two different alleles or two of the same allele at one locus. *Id*.

A DNA profile is a person's specific combination of alleles across several loci. *Id.* Currently, forensic DNA testing examines approximately twenty to twenty-four loci. *NIST Mixture*, *supra*, at 32–33. There are a fixed number of allele possibilities at any given locus, meaning that even unrelated individuals often possess the same allele at one or more loci, a concept known as allele sharing. *Id.* at 58.

10

Because of these variables, complex mixture analysis is significantly more difficult than single-source or simple mixture analysis. *PCAST*, *supra*, at 75. This is particularly true for samples including low-level contributions, which may exhibit an increased prevalence of stochastic, or random, effects that yield a greater incidence of both artifacts (DNA not present in the original sample but appearing in the resulting profile) and missing DNA data. *NIST Mixture*, *supra*, at 43.

**Determining NOC in DNA Mixtures Presents Challenges**

One of the challenges with complex mixtures is determining the number of contributors ("NOC") in the sample, an early step in mixture analysis. *Id.* at 41. This step is not an exact science—it is subjective and error-prone. *See id*. at 36 (describing NOC determinations as opinions "because interpretation of the same evidence may vary from person to person").

Manual NOC determination involves analyzing graphs known as electropherograms, as shown in Figure 1 below, which visualize the raw results of DNA analysis. *DNA Fundamentals*, *supra*, at 206. At each tested locus, electropherograms display peaks corresponding to alleles. *Id*. The presence of three or more peaks at a locus indicates that the sample contains DNA from multiple

11

contributors, since individuals possess at most two alleles per locus. *Id.*, at 322.



Figure 1. *Id.*

Determining the *exact* number of contributors in a sample is challenging. *See* R. Austin Hicklin et al., *Variation in Assessments of Suitability and Number of Contributors for DNA Mixtures*, 65 Forensic Sci. Int'l: Genetics 102892, 7 (2023) (finding twenty-five percent of NOC estimates for "simple mixtures" were incorrect). Electropherograms do not separate alleles by possible contributors. *DNA Fundamentals*, *supra*, at 322–23. Instead, when contributors share an allele, they "stack" on top of one another, resulting in a single peak containing multiple contributors' DNA. *Id.* Because the single peak "masks" individual contributions, analysts must use the relative heights of peaks to attempt to identify different contributors. *Id.* This process is imprecise and subjective. *Id.* at 323, 326.

12

The more contributors to a sample, the more difficult it is to interpret. *NIST Mixture*, *supra*, at 43. Thus, a lab must conduct internal validation testing on samples with every NOC it seeks to analyze in casework. *SWGDAM*, *supra*, at § 4.1.6.3; *ANSI/ASB 020*, *supra*, at § 4.2.3. For example, "[i]f the laboratory protocol allows for the interpretation of mixed DNA for up to four contributors, the supporting validation studies shall include mixed DNA samples from two, three, *and* four contributors." *ANSI/ASB 020*, *supra*, at Annex B (emphasis added).

## Mixtures Containing Relatives Are Difficult to Analyze

Allele sharing makes it more difficult for an analyst to deconvolute, or separate, the profiles in a mixture. *NIST Mixture*, *supra*, at 42. Because alleles are inherited, relatives share more alleles than non-related individuals. *Id.*, at 58. "[T]he closer the relationship the greater the effect." Kalafut et al., *supra*, at 2. "[F]irst-order relatives"—parents, their biological children, and full siblings—have the highest degree of allele sharing. *Id*. As shown in Figure 2, within a conventional family unit (two parents and their full biological children), there are a maximum of four alleles that can be present at any locus. *DNA Fundamentals*, *supra*, at 34–35. If one or both parents possess the same allele at a locus (e.g., [13, 13]), or if the parents share any alleles at a locus (e.g., [11, 13] and [12, 13]), there are fewer allelic possibilities.

13

|  |  | Parent 2 Genotype [7, 8] | |
|---|---|---|---|
|  |  | 7 | 8 |
| Parent 1 Genotype [5, 6] | 5 | [5, 7] | [5, 8] |
|  | 6 | [6, 7] | [6, 8] |

Figure 2.

The presence of first-order relatives further complicates mixture interpretation. Critically, in a DNA sample containing two parents and their biological children, all the children's alleles would be masked because they possess a subset of their parents' alleles. *Id*. This high level of allele sharing can cause STRmix to (1) misestimate mixture proportions and (2) misassign contributor genotypes. *See* Kalafut et al., *supra*, Supplementary Material, Fig. S1 (study by Appellant's expert Tim Kalafut explaining that STRmix may inflate the amount of DNA from some contributors and favor false allele pairs under such a scenario). Indeed, research reveals that mixtures of three first-degree relatives routinely produce both effects. *See* Kalafut et al., *supra*, at 4 (balanced mixtures), 6 (imbalanced mixtures).

14

High levels of allele sharing and masking can lead to underestimation of the NOC. *Id*. at 4 (finding many balanced mixtures comprised of three relatives were underestimated as two-person mixtures and noting, "we believe that interpreting these mixtures as two persons rather than three is a realistic outcome in actual casework").

Accordingly, if a laboratory plans to analyze samples including biological relatives, its internal validation testing must include samples that reflect the level of allele sharing among first-order relatives. *See SWGDAM*, *supra*, at § 4.1.6.5 (requiring internal validation to address allele sharing); *ANSI/ASB 020*, *supra*, at Annex B (noting that validation samples should include DNA from close relatives). Conducting internal validation with representative samples involving relatives is especially important given the high rates of false inclusions when a non-contributor has a first-order relative in a mixture. *See* Corina C.G. Benschop et al., *An Assessment of the Performance of the Probabilistic Genotyping Software EuroForMix: Trends in Likelihood Ratios and Analysis of Type I & II Errors*, 42 Forensic Sci. Int'l: Genetics 31, 34 (2019) (reporting false inclusions for relatives of contributors in 30.56% of three-person mixtures and 63.89% of four-person mixtures).

15

## PGS Systems Retain Elements of Subjectivity

Properly validated probabilistic genotyping software ("PGS") has significant potential to improve DNA mixture analysis, but does not solve all the challenges of interpretation. *NIST Mixture*, *supra*, at 51. STRmix, a common PGS system used by U.S. forensic laboratories, relies on inputs entered by the analyst based on their subjective interpretation. *Id*.

STRmix performs two primary functions: mixture deconvolution and generation of a statistic called a likelihood ratio ("LR"). *Id*. Deconvolution proposes likely profiles for each possible contributor and estimates the relative amount of DNA from each contributor. *Id*. The LR compares the probabilities of two competing propositions. *Id*. at 48. For example, given a DNA mixture with an NOC of three, STRmix may compare the following propositions: the likelihood of observing the DNA results if (1) the person of interest and two unknown, unrelated individuals are contributors or (2) three unknown, unrelated individuals are contributors. *Id*. at 52. The higher the LR, the stronger the support for the first proposition. *Id*. at 48.

NOC calculation is a subjective STRmix input. *Id* at 51. Incorrect NOC inputs can yield "less discriminating LRs (lower LRs for true contributors and higher LRs for non-contributors)," and "false exclusion of true contributors." Hicklin et al., *supra*, at 2.

16

The competing propositions used to generate the LR are another subjective input chosen by the analyst that affects reliable calculation of the statistic. *NIST Mixture*, *supra*, at 52. LR propositions must accurately reflect the features of the samples to generate a meaningful statistic, as "LR results vary when different propositions and assumptions are used." *Id.*

These two subjective *inputs* implicate the reliability of STRmix's two primary *outputs*, deconvolution and generation of the LR. Accordingly, PGS analysis requires careful scrutiny to ensure scientific reliability. *PCAST*, *supra*, at 79.

## ARGUMENT

### I. Representative internal validation testing is required for boundary-pushing PGS applications.

Representative internal validation is essential to comport with Rule 702(d)'s requirement that scientific evidence be reliably applied to the case facts. Fed. R. Evid. 702(d). This is particularly true for complex mixtures that are inherently more challenging to interpret and thus introduce more elements of unreliability.

### A. Rule 702(d) requires representative internal validation testing.

Rule 702 governs admissibility of expert evidence in federal courts, requiring "reliable application of the principles and methods to the facts of the case." *Id.* Reliable application requires rigorous, representative testing before PGS evidence can admitted. *See Daubert*, 509 U.S. at 593 (emphasizing testing as critical to

17

reliability). Otherwise, there is a risk that methods will be unreliably "applied to a different area without sufficient justification, or in an unjustified application." *McCluskey*, 954 F.Supp.2d at 1286 (citation omitted).

It "is an incorrect application of Rule[] 702" to treat flaws in the application of a methodology as "questions of weight and not admissibility."[6] Fed. R. Evid. 702 advisory committee's note to the 2023 amendment. Courts, thus, cannot leave the question of reliable application to juries, which "may … lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *Id.*

Numerous courts have recognized that validation sets limits on the reliability of PGS and explicitly noted the presence or absence of representative internal validation in determining admissibility under Rule 702(d). *See, e.g.*, *Ortiz*, 736 F.Supp.3d at 908 (finding STRmix had not been demonstrated as reliable for applications beyond internal validation limits); *McCluskey*, 954 F.Supp.2d at 1279 (excluding DNA results that exceeded internal validation limits even though other

---

[6] Appellant repeatedly argues that the dispute here is a matter of weight, not admissibility. App. Br. at 32–33, 41, 57–59, 62 (citing *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020); *United States v. Gissantaner*, 990 F.3d 457, 466 (6th Cir. 2021); *United States v. Patterson*, 288 F.App'x 752, 753 (2d Cir. 2008)). Relying on cases decided prior to the 2023 amendment to Rule 702, Appellant makes the precise mistake the amendment sought to clarify.

18

labs had validated procedures for similar samples, noting that "procedures and results … vary from lab to lab"); *Gissantaner*, 990 F.3d at 467, 469 (acknowledging internal validation sets limits on reliability but overturning district court's exclusion of STRmix evidence in part because "laboratory did validate STRmix" for application at issue); *United States v. Morgan*, 53 F.Supp.3d 732, 741 (S.D.N.Y. 2014) ("Each of the three characteristics of the crime scene sample … presented as problematic—the small quantity, the mixed DNA, and the degradation—was tested in [the lab's] … validation studies."); *United States v. Tucker*, No. 18-CR-119 (SJ), 2020 U.S. Dist. LEXIS, at *12–13 (E.D.N.Y. Jan. 8, 2020) (admitting STRmix evidence and noting that the lab's "use of the software appears properly validated for the mixtures at issue in this case").

Consequently, when PGS use goes beyond the limits of a lab's internal validation, courts deem the resulting evidence inadmissible. *See Ortiz*, 736 F.Supp.3d at 908–09 (excluding STRmix evidence where lab had not validated application at issue); *Williams*, 382 F.Supp.3d at 938 (finding expert testimony inadmissible where application fell "outside the parameters of … [the PGS software's] validation" at the lab); *cf. United States v. Russell*, No. 22-50056, 2024 U.S. App. LEXIS 22562, at *5–6 (9th Cir. Sept. 5, 2024) (remanding for reliability

determination where record was unclear as to whether STRmix application exceeded scope of lab validation).

Appellant was required to show that the samples in this case fell within the limits of USACIL's internal validation testing. Appellant failed to do so here.

## B. The samples at issue are highly complex mixtures of DNA from multiple relatives that push the bounds of PGS use.

The DNA samples in this case have all the hallmarks of extremely complex mixtures, making analysis particularly challenging. USACIL analyst Sara Green determined that most samples in this case contain at least three or four contributors and have additional complicating factors like allele sharing. A:570, A:526. Accordingly, these mixtures are undoubtedly complex by scientific standards. *PCAST*, *supra*, at 75; *DNA Fundamentals*, *supra*, at 326; *NIST Mixture*, *supra*, at 23.

The Johnston family necessarily exhibits high levels of allele sharing, increasing the complexity of the interpretation here. The Johnston household has six members: Mr. Johnston, Monica Johnston ("Monica"), their two full biological children (L.J. and M.J.), and two children whose mother is Monica and who each have different fathers (Doe and T.L.). A:462–64. Each person is related to at least two other members of the household and has at least one first-order relative in the home. *Id*. All four children share at least fifty percent of their alleles with Monica. A:527. L.J. and M.J. share the other fifty percent with Mr. Johnston. *Id*. Thus, L.J.

20

and M.J. could be fully masked in a sample containing DNA from Mr. Johnston and Monica. *DNA Fundamentals*, *supra*, at 34–35. All four children likely share many alleles. *See* John M. Butler, *Advanced Topics in Forensic DNA Typing: Interpretation* 352, Table 14.1 (2015) [hereinafter *Advanced DNA*] (indicating that both full and half siblings have a fifty percent chance of sharing at least one allele at each locus due to heredity). Green herself estimated that the children share at least twenty-five percent of their alleles. A:526. The children may share additional alleles from non-hereditary allele sharing between their respective fathers. *See NIST Mixture*, *supra*, at 58 ("[E]ven individuals who are not closely related will share alleles and genotypes.").

Notwithstanding the unique complexity of this case, Appellant never obtained reference samples for T.L., L.J., or M.J. A:566. As the National Institute of Standards and Technology recognizes, "when DNA is recovered from bedding … in a familial sexual assault case, relevant questions include … Can reference samples from the family members be obtained?" Expert Working Group on Human Factors in DNA Interpretation, *Forensic DNA Interpretation and Human Factors: Improving Practice Through a Systems Approach* 65 (2024). Without reference samples, the degree of allele sharing between any of the children, or between T.L. and Mr. Johnston, remains unknown.

21

There is good reason to believe the comforter samples contained DNA from all six family members, adding to the reliability concerns already posed by the samples at issue, and the need for proper validation of interpretation methods for samples of this type. L.J. and M.J. slept in the bed, and Doe and T.L. spent time on the bed. A:510. L.J. and M.J. also wet the bed. A:990 (citing 3500-JD1-050). All four children, thus, likely transferred DNA to the bedding, and there is a very real possibility that they are contributors to the comforter samples. *NIST Mixture*, *supra*, at 21.

Despite these uncontroverted facts, Appellant discounts the likelihood that Doe's three siblings are present in the mixtures. Appellant's claim is undermined by its failure to provide USACIL with the children's reference samples—despite the lab's own recognition that this type of information might shed greater light on the question. A:566, A:512 (acknowledging importance of reference samples, given all children's use of the bed). More to the point, Appellant recognizes that "Monica's DNA was likely to be present" because the samples were recovered from her bed. App. Br. at 57. Yet Appellant fails to apply the same logic to L.J. and M.J., despite recognizing that they sleep in the same bed as Monica every night. *Id.* at 75.

**II.    Because USACIL never internally validated STRmix's ability to distinguish between biological relatives, Appellant's proffered evidence fails Rule 702(d)'s reliability test.**

Put simply, any lab intending to use STRmix to analyze samples containing relatives must perform internal validation testing on samples containing relatives. John M. Butler, *Summarized Info. From Publicly Accessible Validation Studies, Proficiency Testing Results, and Interlaboratory Comparison Data* 26 (2024); *ANSI/ASB 020*, *supra*, at Annex B; *see also Ortiz*, 736 F.Supp.3d at 905, 908 (finding STRmix analysis unreliable where samples exceeded internal validation limits, noting the presence of relatives as a complicating factor); *SWGDAM*, *supra*, at § 4.1.6.5 (requiring internal validation to address allele sharing).

USACIL's failure to internally validate STRmix's ability to distinguish between relatives presents significant reliability concerns. There is no evidence that USACIL's use of STRmix produces reliable LRs when samples contain relatives. Indeed, USACIL itself recognizes that "[b]ased on the question being asked (e.g., is it the [person of interest] versus a relative?), *no statistical weight may be available or reportable*." A:680 (emphasis added). Yet that question—whether the DNA mixtures include Doe versus Doe's relatives—is central in this case. Further, USACIL's lack of validation means the competing LR propositions considered by STRmix do not account for relatedness and thus are irrelevant to the case. As Green

23

concedes, "I don't have capability to run a likelihood ratio for a related person." A:462. Consequently, Green's only option was to run a competing proposition for unknown, *unrelated* individuals. *Id*. This proposition did not reflect the reality that relatives of both Mr. Johnston and Doe were in contact with the comforter, A:510. "*[I]f case context suggests closely related individuals may have contributed to the sample in question, then performing calculations assuming individuals are related will be important to decision makers.*" *NIST Mixture*, *supra*, at 58 (emphasis in original).

Appellant erroneously argues that distinguishing between biological relatives is not relevant to the investigative question of "whether or not the victim's DNA profile is present in a semen stain from the subject." App. Br. at 61. What Appellant fails to acknowledge is that, given the uncontested fact that all six family members spent time on the comforter, identifying both Mr. Johnston and Doe in the mixtures necessarily requires distinguishing between each of them and their biological relatives. A:510.

More to the point, allele sharing here could have resulted in STRmix misattributing alleles across contributors in two ways, casting doubt on the reliability, and admissibility, of the evidence as a whole. *See Amorgianos*, 303 F.3d at 267 (requiring reliability at every step of analysis).

24

First, STRmix could have misattributed alleles belonging to L.J. and/or M.J.—masked and unaccounted for—and erroneously inflated the relative contributions of Mr. Johnston and/or Monica. Kalafut's study found that when NOC was underestimated for mixtures containing two parents and their biological child, STRmix misinterpreted the data as containing only the two parents and inflated the relative contribution of one parent. Kalafut et al., *supra*, at 4. This potential misattribution reveals Appellant's misunderstanding regarding Mr. Johnston and Monica's presence in and relative contributions to the samples. App. Br. at 20–22.

Second, STRmix could have misattributed alleles shared by Monica and Doe's siblings to Doe, resulting in Doe's false inclusion or erroneous inflation of Doe's contribution, undermining the reliability of the results here. "*Not accounting for relatedness can increase the risk of falsely including a non-contributor relative in the DNA mixture.*" *NIST Mixture*, *supra*, at 58 (emphasis in original). Doe and Monica are first-order relatives who share sixty percent of their alleles. A:526. Doe also shares a high percentage of alleles with Doe's siblings. *Advanced DNA*, *supra*, at 352, Table 14.1. Appellant repeatedly argues that Doe is the primary contributor to several comforter stains. App. Br. at 64, 66, 68–70, 72. If Doe was falsely included in these samples, or if Doe's contributions were erroneously inflated by STRmix, Appellant's arguments necessarily fail.

25

The reliability of USACIL's conclusions is further undermined by the fact that the lab violated its own best practices for samples involving biological relatives.[7] USACIL Technical Leader Joel Sutton explained that "when biological relatives are involved and there is an investigative request requiring testing … to distinguish biological relatives, USACIL uses other mechanisms to include requesting references from all these individuals to compare their DNA to the biological evidence in question." A:287. USACIL never received reference samples for the three other children and was unable to conduct this comparison. A:566. Sutton explained that when USACIL cannot distinguish between biological relatives using reference samples, "it can potentially outsource the DNA results to another accredited laboratory" validated to distinguish between biological relatives. A:288. This step, too, was not taken.

USACIL's failure to internally validate STRmix's ability to distinguish biological relatives, A:287, means its use of STRmix fails Rule 702(d). *See Ortiz*, 736 F.Supp.3d at 907–08 (excluding STRmix evidence where analysis exceeded internal validation limits); *see also McCluskey*, 954 F.Supp.2d at 1280 (citing lab's

---

[7] These best practices are themselves questionable. The scientific community recognizes that laboratory protocols and standards should be based on internal validation studies. *DNA Fundamentals, supra*, at 220. No such studies were conducted by USACIL. A:287.

failure to internally validate the type of testing conducted as one rationale for excluding DNA results); *People v. Hillary*, Index No. 2015-15, *3–4, *8 (N.Y. Cty. Ct. Aug. 26, 2016) (precluding DNA evidence due to lack of internal validation for use of STRmix on DNA profiles developed by another lab); *cf. Russell*, 2024 U.S. App. LEXIS 22562, at *5–6 (remanding for reliability determination where record suggested DNA samples fell outside lab's internal validation limits).

In assessing reliability, courts recognize the importance of considering relatedness when mixtures may include relatives. In *Ortiz*, the lab's "failure to account for related individuals in close proximity to the [tested item]" was central to finding the STRmix evidence unreliable and inadmissible under Rule 702. 736 F.Supp.3d at 905. When relatives are possible contributors to a sample, the analytical steps taken are rightfully scrutinized to ensure reliable results. *See United States v. Ferguson,* No. 23-cr-203 (SRN/TNL), 2024 U.S. Dist. LEXIS 80118, *26 (D. Minn. May 2, 2024) (admitting DNA evidence where, unlike here, analyst "considered the possibility that [defendant's two brothers] contributed to the sample," examined reference samples from each brother, and calculated LRs comparing the brothers' DNA to the sample, which supported exclusion of brothers and inclusion of defendant).

27

The facts of this case contrast sharply with prior cases where courts have admitted DNA evidence from less complex mixtures not containing biological relatives. *United States v. Lopez*, No. 3:20-cr-95 (VAB), 2025 U.S. Dist. LEXIS 71304, at *1, *25–26 (D. Conn. Apr. 15, 2025) (finding DNA results reliable under Rule 702 where there was "no evidence that the sample contained DNA from close relatives that would increase the risk of allele sharing"); *United States v. Lewis*, 442 F.Supp.3d 1122 (D. Minn. 2020) (admitting DNA evidence where mixture did not contain any relatives); *Morgan*, 53 F.Supp.3d at 741 (same).

USACIL's failure to internally validate STRmix's ability to deconvolute mixtures comprised of relatives thus renders the evidence unreliable and inadmissible under Rule 702(d). Fed. R. Evid. 702(d).

## III. Appellant's proffered evidence also fails Rule 702(d)'s reliability test because Appellant has not separately demonstrated that USACIL was internally validated to perform NOC determinations on samples containing relatives.

Where NOC "input is in doubt, the reliability of the entire [PGS] analysis is necessarily in doubt." *Williams*, 382 F. Supp. 3d at 935, 937. NOC determination is a critical step in mixture analysis and, as a required input to STRmix, key to every analytical step that follows. *NIST Mixture*, *supra*, at 51. "[T]he [NOC] *always matters during the interpretation* of mixture evidence." *Advanced DNA*, *supra*, at 335 (emphasis in original).

28

Accordingly, NOC determination methodology must be internally validated. *See Amorgianos,* 303 F.3d at 267 (explaining that admissibility requires reliability at every step of analysis). To ensure reliable NOC determinations, validation testing must include testing NOC assignments using samples of similar complexity to casework samples. *See NIST Mixture*, *supra*, at 15 ("[R]eliability cannot be established without validation testing using known samples of similar complexity."). Here, that means validating NOC determinations using samples containing multiple first-order relatives. *See SWDGAM*, *supra*, at § 4.1.6.5 (internal validation of PGS systems should assess allele sharing in mixtures); *ANSI/ASB 020*, *supra*, at Annex B (recommending that internal validation test samples containing DNA from close relatives). Internal validation is necessary, as research shows that lab procedures and error rates for determining NOC vary. Hicklin et al., *supra*, at 5–6.

Appellant failed to meet its burden of demonstrating the reliability of the NOC determinations. Appellant asserts that USACIL has internally validated procedures for determining NOC. App. Br. at 17–18. However, there is no evidence in the record that USACIL's NOC validation included (and thus extends to) mixtures comprised of relatives.

USACIL's lack of relevant internal validation is particularly concerning because the presence of close relatives makes the NOC determinations here uniquely

29

difficult. *See* Kalafut et al., *supra*, at 2 (NOC underestimations occur when samples contain close relatives). As Green testified, under normal circumstances she would determine NOC by looking at *both* the maximum number of allele peaks at any locus *and* the variation in peak heights. A:406, A:419–20, A:536. But M.J. and L.J., who share all their alleles with their parents, would not introduce additional peaks. A:536. As a result, Green had to assign NOC primarily by ruling out unexpected peak height variations. While M.J. or L.J. would have created unexpected variation in the peak heights of their parents' alleles if they contributed a "significant amount" of DNA, "[t]here's just no way for [Green] to tell" whether there were "a few cells worth" of their DNA in the mixtures. A:540. The STRmix developers themselves go further, admitting that in mixtures comprised of two parents and their biological child(ren), if there are "any significant stochastic effects, there may be no indication that the child is present." Meng-Han Lin et al., *The Interpretation of Mixed DNA Profiles From a Mother, Father, and Child Trio*, 44 Forensic Sci. Int'l: Genetics 102175, 3 (2020).

Had USACIL internally validated its NOC methods for samples containing relatives, it might have developed more reliable protocols for mitigating the interpretative challenges that relatives present. Its failure to do so renders Green's

30

NOC inputs—and thus Appellant's STRmix evidence as a whole—incompliant with Rule 702(d). Fed. R. Evid. 702(d).

## IV. Appellant's proffered evidence additionally fails Rule 702(d)'s reliability test because the NOC of these samples likely exceeded USACIL's four-person internal validation limit.

Courts must be vigilant in ensuring that powerful tools like STRmix are not applied beyond the NOC limit set by a lab's internal validation. *Ortiz*, 736 F.Supp.3d at 908 (excluding STRmix evidence where there was no internal validation for NOC over five, and sample likely had an NOC of six); *cf. Russell*, 2024 U.S. App. LEXIS 22562, at *5–6 (requiring a *Daubert* hearing because "record [did] not establish that STRmix was reliably applied" where lab was validated for up to three-person mixtures but one sample "had four assumed contributors").

Appellant has failed to show that the samples here fall within USACIL's validated limit of using STRmix to analyze samples containing no more than four contributors. A:287. Although Green assigned an NOC of three or four to each mixture, A:420–21, several factors suggest the true NOC is at least five. As described, it is likely that L.J. and M.J. are present in the comforter samples. DNA is detectable on bedding after a single night's use and can remain "latent" for some time. Susan F. Petricevic et. al, *DNA Profiling of Trace DNA Recovered from Bedding*, 159 Forensic Sci. Int'l 21, 25 (2006). Appellant's experts agreed that they

31

could not rule out L.J. and M.J.'s presence in the samples. A:540, A:788. Kalafut even concluded that a masked biological child is "the most likely" explanation for Stain 23. A:747–49.

NOC underestimation weakens Appellant's claims of reliability here. NOC is often underestimated for samples with five or six contributors, even in the absence of relatives. Courts have noted that "peer-reviewed studies … suggest that analysts correctly determine NOC for five-person mixtures less than half the time, and that they almost never correctly determine NOC for six-person mixtures." *Ortiz*, 736 F.Supp.3d at 899; *see also Williams*, 382 F.Supp. at 936 ("[T]here remains a high rate of error [in NOC determination], particularly for mixtures above four contributors."); *People v. Thompson,* 2019 NY Slip Op 51521(U), at *6 (N.Y. Sup. Ct. 2019) (stating that it can be "extremely problematic to make a call as to whether three, or instead four or more, people contributed to a complex mixture").

Appellant erroneously argues that, "[h]ad [Green] erred in calculating NOC, the percentages ascribed to each contributor calculated by STRmix would have 'change[d] dramatically' between competing hypotheses." App. Br. at 51. Appellant relies exclusively on Green's statements to support this argument. *Id*. Green's speculation, however, is undermined by literature showing that analysts readily make errors when calculating NOC, particularly for complex mixtures. *NIST*

*Mixture*, *supra*, at 61. Green even admitted that she could not have detected L.J. or M.J. in the samples if they contributed low levels of DNA. A:540.

Kalafut similarly contradicts Appellant's argument, conceding that "a lack of error [in STRmix] doesn't tell us is there a masked biological child or not." A:821. Kalafut explained that an incorrect NOC may lead to an error in STRmix, but no error will return "if there are, for example, three people that happen to share alleles enough so that there is [sic] no more than four alleles at a locus." A739–40. This is precisely the situation here—L.J. and M.J. share *all* their alleles with Mr. Johnston and Monica, meaning that a sample containing all four of them would reveal no more than four alleles at each locus.

Additionally, Appellant's analysts diverged in their NOC assignments for two of the mixtures. Stain 23 was originally assigned an NOC of four. A:445. However, Kalafut testified that it may have had five contributors. A:765. Likewise, while Stain 7 was initially assigned an NOC of three, A:562, Kalafut noted that a fourth contributor was "difficult to rule out," A:788. This contradicts Appellant's assertion that Green would have declined to report a result where the NOC was "inconclusive," App. Br. at 50, and casts further doubt on Green's other NOC assignments.

33

Absent evidence that USACIL internally validated its NOC determination methodology on relatives, Green's NOC determinations were likely underestimates. Thus, Appellant has not met its burden under Rule 702(d) of showing that this application of STRmix was within USACIL's four-person internal validation limit. Fed. R. Evid. 702(d).

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's grant of Tyler Scott Johnston's motion to preclude the DNA analysis in this case.

Dated:  November 26, 2025
      New York, NY

Respectfully submitted,
/s/ *Maneka Sinha*
Maneka Sinha
   *Counsel of Record*
FORENSIC DEFENSE CLINIC
NEW YORK UNIVERSITY SCHOOL OF LAW
New York, NY 10012
(212) 998-6610
maneka.sinha@nyu.edu

Dated:  November 26, 2025
      New York, NY

Respectfully submitted,
/s/ *Katherine Judson*
Katherine Judson
CENTER FOR INTEGRITY IN FORENSIC SCIENCES
Madison, WI 53703
(608) 736-2437
kate@cifsjustice.org

34

<u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Local Rules 29.1(c) and 32.1(a)(4) and Fed. R. App. P. 29(a)(5) and 32(a)(7) because this brief contains 6,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 16.103.1 in 14-point Times New Roman font.

Dated: November 26, 2025
New York, NY

/s/ *Maneka Sinha*
Maneka Sinha
*Counsel of Record*

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

UNITED STATES V. TYLER SCOTT JOHNSTON     DOCKET NO. 25-753-cr

CERTIFICATE OF SERVICE

I, Maneka Sinha, hereby certify under penalty of perjury that on November 26, 2025, I served a copy of Evidence and Forensic Science Scholars' Amicus Curiae Brief by ACMS on:

Allegra Glashausser
Federal Defenders of New York
Eastern District of New York
300 Cadman Plaza West, 16th Floor
Brooklyn, NY 11201

Amy Busa
Margaret Schierberl
Tara McGrath
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

Dated: November 26, 2025
New York, NY

s/ *Maneka Sinha*_____
Maneka Sinha
*Counsel of Record*

36