# 25-753

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

United States,

Appellant,

v.

Tyler Johnston,

Defendant.

On Appeal from an Appealable Order of the
United States District Court for the Eastern District of New York
Case No. 23-cr-13, Hon. Nina R. Morrison

### BRIEF OF THE INNOCENCE NETWORK AS AMICUS CURIAE
### SUPPORTING APPELLEE AND AFFIRMANCE

Jamie T. Lau
Vice President, Innocence Network
Duke Wrongful Convictions Clinic
210 Science Drive
Durham, NC 27708
(919) 613-7764
jamie.lau@law.duke.edu

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for Amicus Curiae

December 1, 2025

**CORPORATE DISCLOSURE STATEMENT**

Amicus is a nonprofit organization. It has no parent corporation, and no publicly held corporation owns any portion of it.

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ................................................................. i

Table of Authorities ................................................................................ iii

Interests of the Amicus Curiae ................................................................ 1

Introduction ........................................................................................... 3

Argument ............................................................................................... 4

I.    Flawed forensic science has long produced an outsized share of
      wrongful convictions. ...................................................................... 4

II.   Gatekeeping matters particularly in criminal cases because of how
      difficult the law makes unwinding wrongful convictions, including
      specifically presenting new forensic evidence of innocence. ................ 7

III.  The Rules Committee specifically urged district courts to exercise their
      gatekeeping function more stringently, and exclude evidence of the
      sort at issue here. ........................................................................... 10

Conclusion ............................................................................................. 16

Certificates ............................................................................................ 1a

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bunch v. State of Indiana,*
964 N.E.2d 274 (Ind. Ct. App. 2012) ........................................................ 6

*Cohen v. Cohen,*
125 F.4th 454, 460 (3d Cir. 2025) ............................................................ 14

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ............................................................................... 11

*EcoFactor, Inc. v. Google LLC,*
137 F.4th 1333 (Fed. Cir. 2025) .............................................................. 14

*Engilis v. Monsanto Company,*
151 F.4th 1040 (9th Cir. 2025) ................................................................ 14

*Exafer Ltd. v. Microsoft Corp.,*
719 F.Supp.3d 749 (W.D. Tex. 2024) ...................................................... 15

*Gilbert v. Lands' End, Inc.,*
--- F.4th ---, 2025 WL 2982190 (7th Cir. Oct. 23, 2025) .......................... 14

*Han Tak Lee v. Tennis,*
No. 4:08-CV-1972, 2014 WL 3894306 (M.D. Pa. June 13, 2014), *report and recommendation adopted, Lee v. Tennis,* 2014 WL 3900230 (M.D. Pa. Aug. 8, 2014), *aff'd, Han Tak Lee v. Houtzdale SCI,* 798 F.3d 159 (3d Cir. 2015) ............. 6

*Howard v. State,*
300 So.3d 1011 (Miss. 2020) ......................................................... 5, 6, 12

*Huss v. Sharkninja Operating LLC,*
2025 WL 257226 (S.D. Ind. Jan. 21, 2025) ............................................. 16

*In re Chrysler Pacifica Fre Recall Products Liability Litig.,*
767 F.Supp.3d 495 (E.D. Mich. 2025) ..................................................... 15

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.,*
2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) .............................................. 15

*In re Paraquat Prods. Liab. Litig.,*
730 F.Supp.3d 793 (S.D. Ill. 2024) .......................................................... 15

*In re Terrorist Attacks on September 11, 2001,*
2025 WL 2383768 (S.D.N.Y. Aug. 18, 2025) ........................................... 15

*Jackson v. Pollion,*
733 F.3d 786 (7th Cir. 2013) ..................................................................... 7

*McCrory v. Alabama,*
144 S.Ct. 2483 (2024) ........................................................................... 8, 9

*Melendez-Diaz v. Massachusetts,*
557 U.S. 305 (2009) ................................................................................. 4

*Pennsylvania v. Finley,*
481 U.S. 551 (1987) ................................................................................. 7

*People v. Genrich,*
2025 COA 49 (Colo. Ct. App. 2025) .......................................................... 6

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Sprafka v. Medical Device Business Servs., Inc.*,
  139 F.4th 656 (8th Cir. 2025) .................................................... 14
*State v. Behn*,
  868 A.2d 329 (N.J. Super. Ct. App. Div. 2005) .................................. 6, 12
*State v. Edmunds*,
  308 Wis. 2d 374 (Wis. Ct. App. 2008) ........................................... 7
*State v. Grad*,
  254 N.E.3d 51 (Ohio 2024) ...................................................... 8, 9
*United States v. Diaz*,
  2024 WL 758395 (D.N.M. Feb. 23, 2024) .......................................... 15
*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ................................................. 11

**Statutes**
28 U.S.C. § 2244(b)(1)-(2) ....................................................... 8

**Other Authorities**
Keith Findley & D. Michael Risiner, *The Science and Law Underlying Post-Conviction Challenges to Shaken Baby Syndrome Convictions: A Response to Professor Imwinelried*, 48 Seton Hall L. Rev. 1209 (2018) .................... 11
Nat'l Research Council of the Nat'l Academies, *Strengthening Forensic Science in the United States: A Path Forward* (Aug. 2009) ............................ 6
National Registry of Exonerations, Search Tool ............................ 2, 5, 6, 8
National Registry of Exonerations, "Albert Algarin" ........................... 11
National Registry of Exonerations, "James Bain" .............................. 14
President's Council of Advisors on Science & Technology, *Forensic Science in Criminal Courts: Ensuring Validity of Feature Comparison Models* (Sept. 2016) . 6
Robert Roberson, Clemency Exhibits ............................................ 9
The Innocence Project, *Misapplication of Forensic Science* .................. 5, 6
Tom Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction*, 115 Yale L.J. 1050 (2006) ........................... 11

**Rules**
Fed. R. Evid. 702 ............................................................ 3, 13
Fed. R. Evid. 702 advisory committee's note to 2023 amendment .............. 13, 14, 15

## INTERESTS OF THE AMICUS CURIAE

The Innocence Network is an association of independent organizations dedicated to providing pro bono legal and/or investigative services to prisoners for whom evidence discovered post-conviction can provide conclusive proof of innocence. The Network's current president is Anna Vasquez of the Texas Innocence Project. The 73 current members of the Network represent hundreds of prisoners with innocence claims in 50 states, the District of Columbia, and Puerto Rico, as well as Argentina, Australia, Brazil, Canada, Ireland, Israel, Italy, Japan, the Netherlands, Taiwan, and the United Kingdom.[1] *Amicus* is also dedicated to improving the accuracy and

---

[1] A full list of participating Network member organizations is as follows: Actual Innocence Clinic at the University of Texas School of Law; After Innocence (CA); Alaska Innocence Project; Arizona Justice Project; Boston College Innocence Program; California Innocence Project; Connecticut Innocence Project/Post-Conviction Unit; Duke Center for Criminal Justice and Professional Responsibility; Exoneration Initiative (NY); Exoneration Project (IL); George C. Cochran Innocence Project at the University of Mississippi School of Law; Georgia Innocence Project; Great North Innocence Project; Griffith University Innocence Project (Australia); Hawai'i Innocence Project; Idaho Innocence Project; Illinois Innocence Project; Indiana University McKinney Wrongful Conviction Clinic; The Innocence Center (CA); Innocence Delaware; Innocence Project (NY); Innocence Project Argentina; Innocence Project at University of Virginia School of Law; Innocence Project Brasil; Innocence Project Japan; Innocence Project New Orleans; Innocence Project of Florida; Innocence Project of Texas; Iowa State Public Defender Wrongful Conviction Division; Italy Innocence Project; Korey Wise Innocence Project (CO); Legal Aid Society Wrongful Conviction Unit (NY); Los Angeles Innocence Project; Loyola Law School Project for the Innocent (CA); Manchester Innocence Project (UK); Michigan Innocence Clinic; Mid-Atlantic Innocence Project; Midwest Innocence Project; Montana Innocence Project; New England Innocence Project; New Jersey Innocence Project at Rutgers University; New York Law School Post-Conviction Innocence Clinic; North Carolina Center on Actual Innocence; Northern California Innocence Project; Notre Dame Exoneration Justice Clinic; Office of the Ohio Public Defender

reliability of the criminal justice system. Drawing on the lessons from cases in which the system convicted innocent persons, the Network advocates study and reform designed to enhance the truth-seeking functions of the criminal justice system to ensure that future wrongful convictions are prevented.

This case is of particular importance to *Amicus* because flawed forensic science is a leading contributing factor to wrongful convictions. Of the 3,755 exonerations nationwide since 1989 tracked by the National Registry of Exonerations, 1,085 involved flawed forensic science. *See* National Registry of Exonerations, Search Tool (last accessed Dec. 1, 2025).[2] Flawed forensic science has cumulatively deprived those individuals of tens of thousands of years of liberty. *Amicus* has a significant interest in preventing those wrongful convictions from occurring at all, and file this brief to ensure that trial courts across the Circuit apply the appropriate legal standard when making admissibility determinations as to purported expert testimony on forensic science topics.

---

Wrongful Conviction Project; Ohio Innocence Project; Oklahoma Innocence Project; Oregon Innocence Project; Proyecto Inocencia de Puerto Rico; Rocky Mountain Innocence Center (UT); Taiwan Innocence Project; Tennessee Innocence Project; Thurgood Marshall School of Law Innocence Project (TX); University of Arizona Innocence Project; University of Baltimore Innocence Project Clinic; University of Miami Law Innocence Clinic; Wake Forest University Law School Innocence and Justice Clinic; Washington Innocence Project; West Virginia Innocence Project; Wisconsin Innocence Project; and Witness to Innocence (PA).

[2] *Available at*:

https://exonerationregistry.org/cases?f%5B0%5D=false_or_misleading_forensic_evidence_466%3A1&f%5B1%5D=n_pre_1989%3A0.

*Amicus* files this brief with the consent of the Parties; no person or entity other than *Amicus* or its counsel contributed resources to or otherwise worked on this brief.

## INTRODUCTION

The District Court properly performed its essential gatekeeping function to exclude unreliable forensic science evidence. District courts always have an important responsibility to keep unreliable evidence out of trials, but that role matters particularly in criminal cases because of the stakes. Hundreds of people have wrongfully lost their liberty after they were convicted based on flawed, undeveloped, repudiated, overstated, or otherwise unreliable forensic science. Such techniques create a particular risk of wrongful conviction because of their propensity to confuse juries. That likelihood of confusion manifests in cases where, as here, the Government puts forward a purportedly new or early-adoption forensic science without a track record of reliability, and even concedes it might lack relevance. Recognizing these problems, the Rules Committee recently modified Fed. R. Evid. 702 specifically to urge courts to do what the District Court did here: exercise the gatekeeping function more stringently, including, as the accompanying comment says, specifically in cases of potentially-flawed forensic science. This Court should affirm for the legal reasons that Appellee has explained, but *Amicus* writes separately to illustrate the life-altering consequences of prosecutors relying on bad or not-yet-validated science to convict people in the absence of other reliable evidence.

3

## ARGUMENT

### I. Flawed forensic science has long produced an outsized share of wrongful convictions.

The Innocence Network and its members have unmatched collective experience with wrongful convictions, and observe that a substantial number of wrongful convictions rested on flawed forensic sciences. Flawed forensic science plays a role in more than a quarter of DNA exonerations, and a higher share still among exonerations that Network members have worked on directly. While those statistics show that even long-validated forensic science can cause serious errors in individual cases, prosecutions that rely on new, untested, or little-tested forensic techniques pose a particular danger of leading to wrongful convictions. And the total number of exonerations tracked by the Registry, if anything, represents an undercount, because of limitations posed by AEDPA and other doctrines on reversing convictions based upon flawed forensic science. That propensity of flawed forensic sciences to contribute to wrongful convictions combined with doctrinal obstacles to unwinding those wrongful convictions after the fact underscore the vital role of trial courts in scrutinizing—and, when appropriate, excluding—purported science prior to trial.

As a numerical matter, flawed forensic science has long plagued the criminal justice system. This is hardly a controversial assertion; the collective "legal community now concedes, with varying degrees of urgency, that our system produces erroneous convictions based on discredited forensics." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 319 (2009) (internal citation omitted). But to put some numbers on the scope of the problem: the National Registry on Exonerations lists

4

more than 1,000 exonerations—more than a quarter of all exonerations tracked by the Registry—that involved false or misleading forensic evidence.[3] That makes "misapplication of forensic science . . . the second most common contributing factor to wrongful convictions."[4] Those exonerations run the gamut of underlying offenses, reflecting the pervasiveness of flawed forensic science in criminal prosecutions of all kinds. *See* "Exonerations by Contributing Factor," *supra* n.4 (listing offenses including sexual assault, murder, drug possession or sale, child sex abuse, fraud, arson, robbery, manslaughter, kidnapping, and other uncategorized violent felonies).

Exonerations following convictions based on flawed forensic science likely represent a substantial undercount of the number of such wrongful convictions. This is because convictions obtained in wrongful reliance on forensic evidence often require better, more reliable forensic evidence to unwind. For example, DNA testing, a now-well-validated forensic science technique, has helped exonerate numerous people prosecutors originally told juries must have committed a crime based upon other types of purportedly-reliable forensic evidence. *E.g. Howard v. State*, 300 So.3d 1011, 1019 (Miss. 2020) (involving flawed bite-mark analysis); *see generally Misapplication*

---

[3] National Registry of Exonerations, "% Exonerations By Contributing Factor" (accessed Nov. 21, 2025), *available at*: https://exonerationregistry.org/cases?f%5B0%5D=false_or_misleading_forensic_evidence_466%3A1&f%5B1%5D=n_pre_1989%3A0 (listing 1,083 exonerations in which false or misleading forensic science contributed to the wrongful conviction).

[4] The Innocence Project, *Misapplication of Forensic Science*, *available at*: https://innocenceproject.org/misapplication-of-forensic-science/; *see also* National Registry of Exonerations, "Exonerations" (accessed Nov. 21, 2025) (listing 3,755 exonerations since 1989, of which 1,083 amount to more than 28.8%).

*of Forensic Science*, *supra*. But in general, it often takes corresponding "advances in forensic science" to "reveal[] weaknesses in the scientific foundations" of methods that generations of prosecutors relied on to obtain convictions—like now-repudiated modes of analysis including but not limited to bite mark analysis,[5] microscopic hair comparisons, tool mark evidence analysis,[6] arson investigation,[7] fingerprint analysis, dog scent evidence, comparative bullet lead analysis,[8] bloodstain pattern analysis, and "shaken baby syndrome." *Id.*; *see also* National Registry of Exonerations, "Shaken Baby Syndrome" (listing 39 exonerations).

Trial courts must exercise the gatekeeping function even as to supposedly infallible forensic sciences. Some such techniques have faced reevaluation and repudiation because of advances in scientific understanding. *See* President's Council of Advisors on Science & Technology, *Forensic Science in Criminal Courts: Ensuring Validity of Feature Comparison Models* (Sept. 2016) at 1; *see also, e.g.*, Nat'l Research Council of the Nat'l Academies, *Strengthening Forensic Science in the United States: A Path Forward* (Aug. 2009) at 4. Other times, the Government attempts to use a

---

[5] *Howard*, 300 So.3d at 1019. "After reviewing the record, we conclude that Howard's evidence as to the change in the scientific understanding of the reliability of identification through bite-mark comparisons was almost uncontested. Based on this record, we agree with Howard that a forensic dentist would not be permitted to identify Howard as the biter today as Dr. West did at Howard's trial in 2000." *Id.*

[6] *People v. Genrich*, 2025 COA 49, ¶¶ 1-2 (Colo. Ct. App. 2025).

[7] *Han Tak Lee v. Tennis*, No. 4:08-CV-1972, 2014 WL 3894306 (M.D. Pa. June 13, 2014), *report and recommendation adopted*, *Lee v. Tennis*, 2014 WL 3900230 (M.D. Pa. Aug. 8, 2014), *aff'd*, *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159 (3d Cir. 2015); *see also Bunch v. State of Indiana*, 964 N.E.2d 274 (Ind. Ct. App. 2012).

[8] *State v. Behn*, 868 A.2d 329, 331-32 (N.J. Super. Ct. App. Div. 2005).

reliable science in a new, unreliable way—as here, using DNA evidence in an untested, unreliable manner. Gatekeeping upfront matters because some wrongfully convicted people do not live long enough to see the "science" used to convict them discredited, in light of how long it may take for scientific advances to demonstrate the flaws in the prior or otherwise unreliable methods. *E.g. State v. Edmunds*, 308 Wis. 2d 374, 386 (Wis. Ct. App. 2008) (discussing delay in scientific advance). Some people are currently incarcerated because juries trusted forensic evidence we have yet to— but will inevitably—learn was unreliable.

## II.    Gatekeeping matters particularly in criminal cases because of how difficult the law makes unwinding wrongful convictions, including specifically presenting new forensic evidence of innocence.

Even where scientific advances discredit previously-utilized unreliable forensic science, post-conviction and habeas procedures impose numerous obstacles to bringing those advances to courts' attention. For one thing, people who have been convicted in reliance on flawed forensic science are poorly-positioned to keep up with new and forthcoming scientific journal articles bearing upon their convictions—nor should they be required to do so. And because there is no guarantee of post-conviction counsel, *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987), wrongfully convicted people generally cannot count on a better-positioned lawyer to bring new scientific advances to their attention. Leaving aside that lawyers are not generally known for scientific prowess, either, *see Jackson v. Pollion*, 733 F.3d 786, 787 (7th Cir. 2013) (noting "a widespread, and increasingly troublesome, discomfort among lawyers and judges confronted by a scientific or other technological issue"), nearly one third of those

whose wrongful convictions involved flawed forensic science also received ineffective assistance of counsel. *See* Exonerations By Contributing Factor, *supra* (listing 336 of 1,085 flawed forensic science exonerations as also including ineffective assistance). So the constitutionally ineffective trial-stage criminal lawyers who worked with defendants convicted by unreliable science may be less well-positioned even than other attorneys to help by following up with them down the line.

Even when people do learn that the flawed, unreliable forensic science used to convict them has since been repudiated, other procedural hurdles often prevent them from using those scientific advances to challenge and overturn wrongful convictions. For example, AEDPA imposes a substantial obstacle for petitions relying on scientific reassessments or advances that occur years after a conviction, because it bars second or successive habeas petitions. *See* 28 U.S.C. § 2244(b)(1)-(2) (calling for dismissal of second or successive petitions). Even to the extent that (b)(2) includes an exception for cases where "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," *id.* at § 2244(b)(2)(B)(i), dating the pace of scientific advancement is hardly amenable to AEDPA's strict timing rules. "[B]ecause science evolves slowly rather than in conclusive bursts, it can be hard to pinpoint when someone should have 'discovered newly-discrediting evidence through the exercise of reasonable diligence.' Unlike a murder weapon left in an abandoned warehouse, forensic science does not lie around waiting for sudden discovery." *McCrory v. Alabama*, 144 S.Ct. 2483, 2486 (2024). *See also State v. Grad*, 254 N.E.3d 51, 75 (Ohio 2024) (observing that "scientific change may occur slowly, over long

periods of time and through measured, incremental advances in scientific knowledge, rather than through a single gobsmacking revelation.").

As a separate but related problem, the strong deference that AEDPA requires courts to give to convictions and its preference for finality often makes undisputed innocence by modern scientific standards legally insufficient. Even a majority of the scientific community changing its view on the reliability of a forensic science technique may not suffice to unwind a conviction. *McCrory*, 144 S.Ct. at 2487 (Sotomayor, J., concurring) (citing source to explain "why someone whose conviction relied on discredited forensic testimony may well be considered indisputably innocent by today's standards, but have no apparent legal avenue for relief"). At every stage of the scientific process, across numerous topics, minority voices advance theories that run counter to general scientific consensus. This is for better and worse. On one hand, initial outlier views on unreliability prove correct over time, and "can then form part of a significant change in the scientific community's understanding of a particular issue that may cast doubt on a criminal conviction." *Grad*, 254 N.E.3d at 69. On the other hand, scientific dissent can allow prosecutors to defend convictions—and delay exonerations—by pointing to outlier views that doggedly cling to ideas that new evidence has repudiated.[9] And whether or not the Government retains an expert

---

[9] One high-profile shaken baby syndrome case has led scientists, faith leaders, lawyers, more than 80 members of the Texas state legislature, and even law enforcement who worked on the conviction itself, to acknowledge the unreliability of the forensic science supporting the conviction and his actual innocence—and yet Robert Roberson remains not only in prison, but subject to a series of temporary reprieves from execution and reliant only on possible executive clemency. *See* Robert Roberson, Clemency Exhibits, *available at*:

willing to express an outdated or outlier view about the reliability of flawed science, a wrongfully convicted person must still contend with previously-admitted testimony and evidence. To mount a challenge, a defendant must generally obtain not only a post-conviction attorney, but also scientific experts who can evaluate the new science in order to determine and explain how it applies to the facts of the defendant's case. This is a uniformly expensive endeavor outside the capacity of many wrongfully convicted people, and yet it is nearly impossible to successfully repudiate unreliable forensic evidence without it.

### III.  The Rules Committee specifically urged district courts to exercise their gatekeeping function more stringently, and exclude evidence of the sort at issue here.

The District Court correctly exercised its gatekeeping function here, acting in accordance with the Rules Committee's recent instruction to apply rule 702 more stringently. Advisory Committee notes to the Federal Rules of Evidence urge more careful gatekeeping specifically because of the possibility of wrongful convictions. That urging reflects the unique power that forensic evidence has to influence juries. The consequences of that influence can have devastating effects in criminal cases where life and liberty are at stake—and a jury confronts forensic evidence purporting to support a guilty verdict. The stakes, and the risk of introducing flawed forensic science, requires courts to perform the gatekeeping function with care, and here

---

https://drive.google.com/file/d/1x8qLhoYLsUvBT-Ii1K1yUDEUB_v8ulHF/view (collecting 80 pages of letters).

counsels in favor of deferring to the District Court's correct assessment of reliability and resulting exclusion.

As important context, numerous courts—including the Supreme Court—have described the power of expert evidence to persuade juries regardless of its underlying validity. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993); *see also United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (warning of the "talismanic significance" that "lay jurors" may assign to expert testimony). That difficulty is particularly acute when it comes to scientific evidence—because research demonstrates that people "overestimate the probative value of scientific evidence." Tom Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction*, 115 Yale L.J. 1050, 1068 (2006).

Flawed scientific evidence drives wrongful convictions in part because that overweighting can obscure pervasive weakness in prosecution cases. Forensic evidence can help prosecutors convict defendants in the absence of other corroborating evidence. *See* Keith Findley & D. Michael Risiner, *The Science and Law Underlying Post-Conviction Challenges to Shaken Baby Syndrome Convictions: A Response to Professor Imwinelried*, 48 Seton Hall L. Rev. 1209, 1218 (2018) (discussing use of expert forensic evidence in shaken baby syndrome cases that by their nature lack eyewitnesses).[10] Courts often point to a lack of other reliable

---

[10] For crimes involving children, like this one, misleading forensic evidence can also obscure when children's testimony has been manipulated by adults. *See* National Registry on Exonerations, "Albert Algarin," *available at*: https://exonerationregistry.org/cases/11074 (describing "a wave of allegations of child

evidence when granting years-later post-conviction relief. For example, in one of the cases reversing a conviction based on repudiated bite-mark analysis, the court noted that the flawed expert testimony had been "by far the most important evidence" for the Government, because the "other evidence" the Government used to suggest guilt included only that the defendant had lived two blocks from the victim; that an ex-girlfriend mentioned he had previously bitten her during consensual sex; and that he had made "cryptic comments" to a detective that nevertheless "revealed no details about the crime." *Howard*, 300 So.3d at 1019. With the hindsight of an exoneration, such evidence looks woefully insufficient. In another exoneration based on advances in forensic science, the judge observed even at the initial criminal trial that "this was a highly circumstantial case," with the direct appellate court echoing that assessment and dubiously observing that such evidence was sufficient to prove guilt beyond a reasonable doubt only "if the jury drew all the available inferences in favor of the prosecution." *Behn*, 868 A.2d at 331. But juries often fail to recognize these clear evidentiary weaknesses at the time precisely because of expert forensic testimony that insists upon guilt.[11]

---

sex abuse at day care centers across the nation that ultimately were shown to be the product of unreliable testimony from children produced by manipulative interviewing techniques by child welfare workers, therapists and law enforcement").

[11] *See also* National Registry of Exonerations, "James Bain," *available at*: https://exonerationregistry.org/cases/10244 (describing a child sex abuse conviction obtained against a man with blood type AB, despite the actual attacker having blood type B, because a forensic expert wrongly told the jury that Bain's "weak A" meant the difference could not exclude him; Bain served 35 years before his exoneration).

Recognizing this, the Rules Committee amended Fed. R. Evid. 702 in 2023 to emphasize the importance of district courts exercising their gatekeeping function. By its text, the change requires the proponent of expert testimony to prove to the Court's satisfaction that "it is more likely than not that . . . (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The Committee explained it viewed that change as necessary because courts had "failed to apply correctly the reliability requirements of that rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The Committee pointed to the importance of gatekeeping considering the propensity of expert testimony's propensity to persuade jurors, even when flawed or unreliable. "Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *Id*. As especially relevant here, to dispel any doubt, the Committee pointed to precisely the dynamic that underscores wrongful convictions in flawed forensic science cases:

> "The amendment is especially pertinent to the testimony of forensic experts in both criminal and civil cases. . . In deciding whether to admit forensic expert testimony, the judge should (where possible) receive an estimate of the known or potential rate of error of the methodology employed, based (where appropriate) on studies that reflect how often the method produces accurate results."

*Id*.

13

Courts of Appeal have since underscored the Committee's admonition. The Ninth Circuit acknowledged its pre-2023-amendments precedent "stat[ing] that Rule 702 should be applied with a 'liberal thrust' favoring admission," but has now clarified that "[o]ur caselaw should not be understood to suggest a presumption of admission. There is no such presumption." *Engilis v. Monsanto Company*, 151 F.4th 1040, 1049 (9th Cir. 2025). The Third Circuit, in a post-2023-amendments decision reversing a district court that had admitted unreliable expert testimony, explained that "[d]istrict courts are tasked with a rigorous gatekeeping function" and said that the trial court's process there "fell short of the rigor required" by Rule 702. *Cohen v. Cohen*, 125 F.4th 454, 460, 461 (3d Cir. 2025). Other Circuits have discussed the amendments and characterized them as tightening standards to limit admissibility of unreliable expert testimony. *See Gilbert v. Lands' End, Inc.*, --- F.4th ---, 2025 WL 2982190, *5 n.3 (7th Cir. Oct. 23, 2025) ("This amendment was made to clarify that 'questions of the sufficiency of an expert's basis[ ]' go to admissibility just as with questions of 'the application of the expert's methodology.' Fed. R. Evid. 702 advisory committee's note to 2023 amendment."); *Sprafka v. Medical Device Business Servs., Inc.*, 139 F.4th 656, 660 (8th Cir. 2025) ("In 2023, Rule 702 was amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule.") (internal citation omitted); *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1339 (Fed. Cir. 2025) (discussing 2023 amendments and the importance of district courts' gatekeeping function).

District courts, too, have generally applied the criticism embodied in the amended Rule. They have acknowledged that "[t]he Advisory Committee on Evidence Rules proposed the changes in response to court decisions that admitted expert testimony too liberally." *In re Terrorist Attacks on September 11, 2001*, 2025 WL 2383768, *2 (S.D.N.Y. Aug. 18, 2025).[12] And they have recognized that the amendments "reflect an intent to empower courts to take seriously their roles as gatekeepers of expert evidence." *United States v. Diaz*, 2024 WL 758395, *5 (D.N.M. Feb. 23, 2024).[13] They have concluded that judges "cannot bypass this gatekeeping responsibility and pass it off to the jury," *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, *2 (S.D.N.Y. Jan. 30, 2025),[14] and consequently rejected requests by litigants to have juries decide the reliability of expert methodologies as a matter of fact. *E.g. Huss v. Sharkninja Operating LLC*, 2025 WL 257226, *5 (S.D. Ind. Jan.

---

[12] *See also, e.g.*, *In re Chrysler Pacifica Fre Recall Products Liability Litig.*, 767 F.Supp.3d 495, 504 (E.D. Mich. 2025) (explaining that the 2023 amendments "reinforce the idea, sidestepped sometimes by some courts, that Evidence Rule 104(a) entrusts the court with deciding whether the admissibility criteria have been satisfied, rather than treating them as 'questions of weight' to be determined by the factfinder" and citing Fed. R. Evid. 702 Advisory Committee Notes to 2023 Amendments).

[13] *See also, e.g.*, *In re Paraquat Prods. Liab. Litig.*, 730 F.Supp.3d 793, 806 n.9 (S.D. Ill. 2024) (observing that "The Advisory Committee thus appears to have found that courts had erroneously admitted unreliable expert testimony" and consequently explaining that "[m]indful of its role as the witness stand's 'vigorous gatekeeper,' the Court will closely scrutinize the reliability of proffered expert testimony before permitting an expert to share her opinion with the jury.").

[14] *See also, e.g.*, *Exafer Ltd. v. Microsoft Corp.*, 719 F.Supp.3d 749, 752 (W.D. Tex. 2024) (noting that "Rule 702 was amended effective December 1, 2023 to clarify" that proponents of expert testimony must demonstrate reliability).

21, 2025) ("Ms. Huss's proposal—that the jury decide for itself whether Mr. King's methodology is reliable—flies in the face of the 2023 amendment to Rule 702 and the Court rejects it.").

Under the circumstances in this case, the District Court here correctly joined the numerous district courts that have heeded the Advisory Committee's admonition and followed the Rule's amended text. It correctly excluded unreliable, unvalidated use of DNA evidence that might well have produced a wrongful conviction that would have deprived Mr. Johnston of his liberty in the short term and proved difficult to unwind in the medium or even long term. This Court should affirm, both to avoid those possible results and to join its sister Circuits in acknowledging the import of the 2023 amendments to the Federal Rules of Evidence—and the need to keep unreliable expert testimony from unduly influencing juries, especially in criminal cases.

## CONCLUSION

For the foregoing reasons, in addition to those in the Appellee's brief, the judgment of the District Court should be affirmed.

Respectfully submitted,

/s/ Jim Davy

Jamie T. Lau
Vice President, Innocence
   Network
Duke Wrongful Convictions Clinic
210 Science Drive
Durham, NC 27708
(919) 613-7764
jamie.lau@law.duke.edu

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for Amicus Curiae

December 1, 2025

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4) because it contains 4,291 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.103.1, set in Century Schoolbook 12-point type.

/s/ Jim Davy

Jim Davy

## CERTIFICATE OF SERVICE

I certify that on December 1, 2025 this brief was filed using the Court's AMCS system. All participants in the case are registered AMCS users and will be served electronically via that system.

I further certify that, after receiving notice that the brief has been accepted for filing, I will file 6 paper copies of this brief with the Clerk of Court within the required time.

/s/ Jim Davy

Jim Davy