# 25-753

*To Be Argued By*:
MARGARET SCHIERBERL

# United States Court of Appeals

## For the Second Circuit

◆◆◆

UNITED STATES OF AMERICA,

*Appellant,*

—against—

TYLER SCOTT JOHNSTON,

*Defendant-Appellee.*

_____

**On Appeal From The United States District Court
For The Eastern District of New York**

## REPLY BRIEF FOR THE UNITED STATES

JOSEPH NOCELLA, JR.,
*United States Attorney*,
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

AMY BUSA,
TARA B. MCGRATH,
MARGARET SCHIERBERL,
*Assistant United States Attorneys*,
   *Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................ii

PRELIMINARY STATEMENT .................................................. 1

ARGUMENT - THE DISTRICT COURT'S ORDER
        SHOULD BE REVERSED ............................................... 3

    I.    The District Court Abused Its Discretion by
        Excluding Reliable DNA Evidence from the
        Bed in Which the Alleged Sexual Assault
        Occurred ......................................................................... 3

        A.    The Standard for Reliability is Satisfied
             Here ................................................................. 3

        B.    Green Had Sufficient Facts and Data to
             Conduct Her Analysis ................................... 11

        C.    Failure to Parse Admissible Testimony
             is Error ........................................................... 18

    II.   The District Court Erred by Excluding Highly
        Relevant DNA Evidence ....................................... 20

    III.  The District Court Erred by Significantly
        Overstating the Risks and Failing to Consider
        Mitigating Measures ............................................. 30

CONCLUSION ...................................................................... 35

ii

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ...................................................... 10

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996) ...................................................... 19

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ...................................................... passim

*Engilis v. Monsanto Co.*,
   151 F.4th 1040 (9th Cir. 2025) ............................................ 18, 19 n.9

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) ................................................ 19 & n.9, 20

*McFee v. BJ's Wholesale Club, Inc.*,
   No. 21-CV-3087 (MKB),
   2025 WL 2442837 (E.D.N.Y. Aug. 25, 2025) ................................. 19 n.9

*United States v. Abu-Jihaad*,
   630 F.3d 102 (2d Cir. 2010) ...................................................... 21, 24, 34

*United States v. Cantoni*,
   No. 19-4358,
   2022 WL 211211 (2d Cir. Jan. 25, 2022) ......................................... 5 n.2

*United States v. Dupree*,
   706 F.3d 131 (2d Cir. 2013) ...................................................... 30

*United States v. Garnes*,
   102 F.4th 628 (2d Cir. 2024) .................................................... 30, 32, 33

*United States v. Gissantaner*,
   990 F.3d 457 (6th Cir. 2021) ...................................................... passim

*United States v. Green,*
No. 22-3217,
2024 WL 4488577 (2d Cir. Oct. 15, 2024)................................5

*United States v. Lewis,*
442 F. Supp. 3d 1122 (D. Minn. 2020) ......................................5, 16-17

*United States v. Martinez,*
54 F.3d 1040 (2d Cir. 1995) ...................................................34

*United States v. McDermott,*
245 F.3d 133 (2d Cir. 2001) ...................................................30

*United States v. Ortiz,*
736 F. Supp. 3d 895 (S.D. Cal. 2024) .....................................17

*United States v. Quattrone,*
441 F.3d 153 (2d Cir. 2006) ...................................................21, 24

*United States v. Russell,*
No. 22-50056,
2024 WL 4054382 (9th Cir. Sep. 5, 2024))...............................5 n.2

*United States v. Seward,*
135 F.4th 161 (4th Cir. 2025) .................................................18 n.8

*United States v. Williams,*
382 F. Supp. 3d 928 (N.D. Cal. 2019)......................................5-6 n.2

*United States v. Zottola,*
Nos. 23-6378, 23-6401,
2025 WL 3137727 (2d Cir. Nov. 10, 2025)..............................34

## RULES

Fed. R. Evid. 401....................................................................2, 33

Fed. R. Evid. 403....................................................................2, 30

iv

Fed. R. Evid. 702.................................................................. passim

Fed. R. Evid. 702(a) ...................................................................2

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 25-753

———————————

UNITED STATES OF AMERICA,

*Appellant*,

-against-

TYLER SCOTT JOHNSTON,

*Defendant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

## PRELIMINARY STATEMENT

The United States respectfully submits this brief in reply to Defendant-Appellee Tyler Scott Johnston's responsive brief.

The government appealed from an order of the district court in the prosecution of Johnston for the years-long aggravated sexual abuse of his minor stepdaughter, Doe. The challenged order precludes expert testimony regarding six stains of Johnston's semen mixed with DNA from

2

his wife and Doe in a trial alleging Johnston sexually assaulted Doe ("Order").

In so ruling, the district court abused its discretion in finding that the DNA evidence: (1) was scientifically unreliable under Federal Rule of Evidence 702 ("Rule 702") where the court (but no expert) determined there were additional, undetected contributors to the DNA samples; (2) was of little to no relevance to any factual dispute at trial—including whether Doe was sexually abused on the areas of the bed where the DNA evidence was recovered—pursuant to Rule 702(a) and Federal Rule of Evidence 401 ("Rule 401"); and (3) was substantially outweighed by the danger of misleading the jury and confusing the issues under Federal Rule of Evidence 403 ("Rule 403"), without considering curative measures.

As shown below and in the government's principal brief, Johnston's arguments in support of the Order and the Order itself are unpersuasive, and the Order should be reversed.

ARGUMENT

THE DISTRICT COURT'S ORDER SHOULD BE REVERSED

I.    The District Court Abused Its Discretion by
      Excluding Reliable DNA Evidence from the
      Bed in Which the Alleged Sexual Assault Occurred

The district court abused its discretion by precluding a near-textbook analysis of ample DNA evidence as scientifically unreliable under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).[1]  Johnston's transparent attempt to paint the relevant standard as one of infallibility should be rejected.  To the contrary, the analysis conducted here by a seasoned USACIL forensic biologist was based on reliable methods and a reliable application thereof.

A.    The Standard for Reliability is Satisfied Here

The district court's conclusion, echoed by Johnston, that the expert DNA analysis here using STRmix "lacked reliable methods or sufficient facts" misconstrues the applicable legal standard and the facts

---

[1]    Unless otherwise noted, all case quotations omit internal quotation marks and citations and accept alterations.  This brief adopts all abbreviations in the government's opening brief.  "Br.," "GBr.," "NYU Br.," and "LA Br." refer to Johnston's brief, the government's principal brief, and amicus briefs by scholars of evidence and forensic science, and the Legal Aid Society and defense attorneys, respectively.

4

and should be rejected. (Br.2, 27, 32). Here, the relevant question is whether USACIL conducted its DNA testing and analysis in compliance with its internal validations. It did so here.

"In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity*." *Daubert*, 509 U.S. at 590 n.9. Relevant factors may include: (1) testability, (2) the extent of peer review and publication, (3) known or potential rates of error, (4) whether there are maintained "standards controlling the technique's operation," and (5) acceptance within the relevant scientific community. *Id.* at 593-94; (GBr.32-41).

Numerous courts, including this Court, have found admissible DNA evidence relying on STRmix in the face of general and specific challenges to its reliability, both before and after the 2023 amendment to Rule 702. *See, e.g., United States v. Gissantaner*, 990 F.3d 457, 463-66 (6th Cir. 2021) (reversing trial court's ruling precluding STRmix evidence as unreliable in a felon-in-possession case; finding under Rule 702 and *Daubert* that STRmix is "testable and refutable," "clears th[e] bar" of peer review, had a known error rate and "garner[s] wide use in forensic laboratories," evidencing its acceptance in the scientific community); *see*

*also United States v. Green*, No. 22-3217, 2024 WL 4488577, at *1 (2d Cir. Oct. 15, 2024) (summary order), *cert. denied*, 145 S. Ct. 1216 (2025) (affirming admissibility of STRmix evidence and rejecting challenges to methodology for calculating NOC as "unreliable" where analyst followed relevant protocols). In *Gissantaner*, the Sixth Circuit found a STRmix analysis admissible where the laboratory "complie[d] with the guidelines promulgated by [SWGDAM], as confirmed through" an FBI audit, the analyst had more than one year of experience, and the laboratory was internally validated for the use of STRmix. 990 F.3d at 467. This Court has held that the same process Green used to determine NOC here is "scientific," not simply a matter of the "technician's whims," *Green*, 2024 WL 4488577, at *2; *see also United States v. Lewis*, 442 F. Supp. 3d 1122, 1141 (D. Minn. 2020) (describing the analysis as involving "well-recognized guideposts"); (A:405-11).[2]

_____

[2]        By contrast, the cases on which Johnston relies (Br.28-29, 35) are inapposite. *See United States v. Cantoni*, No. 19-4358, 2022 WL 211211, at *1 (2d Cir. Jan. 25, 2022) (summary order) (precluding defense expert whose proffered opinions were "a mere conduit to hearsay"); *United States v. Russell*, No. 22-50056, 2024 WL 4054382, at *1 (9th Cir. Sep. 5, 2024) (summary order) (finding district court erred when it denied defendant's motion to preclude DNA evidence without explanation beyond that it "qualifies"); *United States v. Williams*, 382 F. Supp. 3d 928,

6

Here, each Rule 702 requirement is met by a preponderance of the evidence. Indeed, Johnston does not dispute that USACIL has conducted internal validations, is subject to regular external audits, and employs policies and procedures that ensure consistent, testable, and reliable NOC calculations. (A:286, 406-07, 680). He does not dispute that USACIL's validation involved studies "utilizing ground-truth data to include mixtures at varying DNA amounts, contributor proportions, and number of contributors...that most resemble actual [] samples encountered in casework," including "contributor assessments evaluating the impact with under- or over-estimating the true number." (A:286). Nor does he dispute that external auditors annually review USACIL's work, which includes review of USACIL's policies, including the policy that "mixtures involving biological relatives that cannot be deduced into individual contributors should be interpreted and reported with caution due to increased allele sharing." (A:286, 406-07, 680). That policy thus

---

930-32, 935-37 (N.D. Cal. 2019) (precluding DNA evidence where laboratory was validated to conduct testing on samples of up to four contributors, but, *inter alia*, both the chief forensic serologist and an internal reviewer concluded there were five contributors to the relevant sample).

permits reporting where mixtures involving biological relatives *can* be deduced into individual contributors, as was done here (and, similarly, in other cases involving related individuals). (A:369).

Johnston's sole dispute—that USACIL does not calculate likelihood ratios for *relatedness*—has no bearing in this case or in the other similarly-situated cases USACIL analyzes annually. Here, the investigative question is whether the victim's DNA is present in Johnston's semen stains. (Br.32-34; NYU Br.6-7).[3]

Even were it the controlling question, Green could discern, pursuant to USACIL procedure, whether Doe's siblings' DNA were in Johnston's semen stains, and she concluded they were not. (A:537-38, 566, 579).[4] The only other testifying expert concurred with Green's

---

[3]   It is thus immaterial that USACIL has not internally validated for relatedness or for samples containing more than four contributors (NYU Br.7), which is a conclusion *no* expert reached for any of the samples analyzed.

[4]   Doe's siblings were approximately four, six, and eleven years old when the evidence was collected. (SA:483). Given their very young age, the government did not seek to forcibly collect buccal swabs of them through a search warrant. While the government submits that the collection of these references is unnecessary here, if this Court disagrees, upon court authorization of such a search warrant, the government could request USACIL re-analyze each sample with the references of

analysis. (A:741-42). Notably, had Green been unable to deduce contributors or otherwise felt she had insufficient information, policy required that she report inconclusive results as uninterpretable and/or outsource the analysis. She did not do so. (A:288, 676-89).

Despite expert testimony to the contrary, Johnston and amici claim the samples here are "extremely complex." (Br.2; NYU Br.6-7, 20-21). This is not so. While even "[e]qual quantities of three people doesn't necessarily make [the analysis] more complex" (A:501), here, no stain reflects equal contributions from donors (A:697-709). And every sample save for one had the optimal amount of DNA for testing. (A:399-400, 638-40, 643). Indeed, Green developed full profiles at each of the 21 loci tested for *each* sample and *each* reference. (A:376, 401, 421-24). Finally, while amici stress the potential for "high allele sharing," and invent not only the possibility but a "likelihood that Doe's three siblings are present in the mixtures" (NYU Br.22), no expert reached this conclusion. In contrast, Monica had eight unique alleles relative to Johnston and Doe,

---

Johnston's other biological and adopted children as an alternative means to quash Johnston and amici's argument.

which Green testified "would make a very unique comparison." (A:580-81). The only other expert to testify concurred. (A:741 ("I see no sign of a potential biological child as a contributor….Because there are three loci where [the defendant] has alleles that are unique to Mrs. Johnston and to Jane Doe.")). Neither testifying expert concluded that there was a masked child in any analyzed sample, a "likelihood" amici seem to have invented out of whole cloth. (NYU Br.22); (A:566, 748, 764-65). That there may exist in other cases more complex data sets—*i.e.*, involving fully related first-order relatives in balanced mixtures, for example—is of no moment. This case's facts moot Johnston's and amici's argument.

By following USACIL's policies and procedures, and relying on her extensive expertise, Green reliably calculated NOC in the DNA mixtures she analyzed. As Green testified, she followed the "best practice" in looking at the mixture, assessing NOC, and then comparing the evidence to the references. (A:417-18). She analyzed the number of alleles and the alleles' peak heights at each of the 21 loci per stain. (A:419-20, 529-30). She considered the prospect of masked children and concluded, "based on the data that I had, I didn't think that there w[ere] any indications of additional biological children of Monica and [Johnston]

together being in these." (A:566). She then tested her initial hypothesis in STRmix. (A:424-25). Had Green interpreted NOC incorrectly, the percentages ascribed to each contributor calculated by STRmix would have "change[d] dramatically" between competing hypotheses. They did not. (A:432-33, 697-709). Neither Johnston nor the court identified anything in the data to suggest Green erred as to any of the three-person mixtures.

While amici argue that two of Doe's half-siblings could be fully masked in a sample containing DNA from Johnston and Monica (NYU Br.20-21), we know that is untrue. Allele sharing affects peak heights. At its simplest, if two people's DNA contributes to the same allele, for example, Johnston and one of his biological children, that allele's peak height would increase correspondingly. (A:198-200, 417-20, 583-84). Green considered not only the number of peaks but peak heights to estimate contributors to each stain according to best practices. (A:364, 420). She saw no evidence of hidden additional contributors. (A:418-24, 566). For five of the six stains, *i.e.*, each of the three-contributor stains, Kalafut concurred. (A:734-35, 763-65).

11

That Kalafut speculated about (but did not confirm) the prospect of an additional contributor in the single four-person mixture is not a basis to preclude the entirety of Green's testimony. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not render the opinion inadmissible, unless "the flaw is large enough that the expert lacks 'good ground' for his or her conclusions.").

### B. Green Had Sufficient Facts and Data to Conduct Her Analysis

Johnston further contends that Green lacked sufficient facts to guide her testing and analysis. This argument fails.

Johnston's allegation that Green "lacked information about who regularly used the comforter" (Br.32) is false. Johnston claims that "the government failed to tell the analyst that…Johnston,…Monica, and two of their children [] slept in the bed every night, or that all four children, including Doe, used the bed during the daytime." (Br.2). He further improperly alleges that "[o]nly after the [*Daubert*] hearing testimony and oral argument did the government reveal that Doe spent

leisure time on the bed…and that her two younger siblings slept in the bed every night" (Br.20-21), contending that the government "failed to provide Green the relevant case information about who used the comforter" (Br.44).

The record is clear. "At the time of Green's testing, Monica had reported that the children wrestled on Johnston's bed." (GBr.24; SA:171). "After the filing of the defendant's motion, it became apparent that certain of Doe's siblings also slept in Johnston's bed." (GBr.24-25). This additional information regarding Doe's siblings sleeping in the bed was provided to the government during a March 11, 2025, interview— after the evidentiary hearing on February 28, 2025, and March 7, 2025. No information was withheld. (SA:537). At the time of testing, Green was aware that the other children used the bed. (GBr.24; SA:171). In response to the district court's query *following* the evidentiary hearing, on March 11, 2025, the government asked Doe whether and how Doe spent time on the bed and promptly provided Doe's responses, which indicated that, independent of being raped, Doe spent the least amount of time on the bed compared with her siblings. (SA:537-38).

Johnston's contention that "information about who regularly used the comforter and the reference DNA samples from three family members" were "pieces of information that [Green] might have used to blunt the impact from her lab's testing limitations" (Br.32) misunderstands both Green's analysis and testimony. In contrast to Johnston's position, Green followed "best practice[s]," according to both testifying experts, in conducting her analysis. (A:417-18, 425). These best practices dictate first analyzing the sample to determine NOC and then comparing the references to prevent bias. Green did so here. (A:417-18). In conducting her analysis, Green considered that a sample's contributors may share some DNA, whether by chance or relatedness. (A:381-82, 425). Given the prospect of incidental allele sharing even among unrelated persons, examining more locations generates a "more discriminating" analysis, which she did. (A:381-84, 400-01, 415). Additionally, allele sharing affects peak height; specifically, if two people's DNA contributes to the same allele, the allele's peak height increases as a result. (A:198-200, 417-20, 583-84). Aware of this, Green analyzed peak heights and the number of peaks to estimate NOC and compared this evidence to the references. (A:420). Based on her initial

14

interpretation of the data, Green identified Monica, Johnston, and Doe as the three contributors to Stains 7, 10, 11, 20, and 25. (A:418-24). Green concluded that Stain 23 was a mixture of four people, including Monica, Johnston, Doe, and one unknown person. (A:424).

The argument that Green erred in assuming the presence of Monica, but not Monica's biological child who slept in the bed (NYU Br.22) misunderstands best practices in DNA testing. Green conditioned her hypotheses on the presence of Monica's DNA in each mixture, given her knowledge that the bedspread was from a bed shared by Monica and Johnston, that Monica was the major contributor to two additional stains collected from the bedspread, and that the data supported the inclusion of Monica's DNA in each stain. (A:383-84, 407-08, 421, 425, 531). Conditioning a LR is a "best practice." (A:203-04, 288, 384, 425). When a LR is conditioned, STRmix assumes the presence of that contributor's DNA and considers the remaining unaccounted-for DNA in calculating its LR. (A:383-84, 425, 531). Conditioning on Monica was ideal because it was an assumption supported by the case information and the data. No one disputes that the evidence was collected from a bed shared by Johnston and Monica and in which Johnston and Monica had sex. (A:376,

15

425).  This alone differentiates Monica from a child who slept in the bed.

Further, Monica was the overwhelming contributor to two stains

recovered from the bedspread.  (A:368, 421, 491-92, 500).  Therefore,

Green knew Monica's DNA was present on the bedspread.  The same

cannot be said for any child other than Doe.  Finally, Green observed

Monica's alleles in each of the six stains in which she was ultimately

conditioned.  (A:421-22).  The same cannot be said of any child (save,

again, for Doe).[5]

Green clearly had sufficient facts and data to conduct her

analysis.  Each relevant stain contained ample DNA, well above

---

[5]    Any arguments regarding transference (LA Br.9) do not
dispute that the DNA is present or that the methods to determine its
presence are reliable; rather, they raise a question of proof for the jury to
resolve.  Similarly, amici's arguments that the DNA evidence indicates
who was involved, but not how or when the crime occurred (LA Br.9, 14;
NYU Br. 26-27) do not warrant the evidence's exclusion, especially
where, as here, there is direct evidence from Doe explaining the sources
of the DNA evidence.  Instead, such arguments are properly tested by
cross-examination and arguments to the jury.  Indeed, the government is
offering the DNA evidence to establish the "who" and relies on other
evidence to establish the "how" and "when."  Multiple amici claim that
jurors overweigh DNA evidence, but they fail to acknowledge the effect
of robust cross-examination and argument.  Further, when relevant,
proper jury instructions can cure any alleged improper risk of conflation
between source-level and activity-level analysis of the DNA evidence.

16

USACIL's threshold for forensic testing. Indeed, all but one sample had more than 1 nanogram of DNA, the optimal amount for testing. (A:388-89, 400, 643). Green developed full profiles at each of the 21 loci tested for every sample reference. (A:376, 401, 414-15, 421-24).[6]

Moreover, as the experts testified, Monica, Johnston, and Doe each have alleles unique to the others. (A:580-81 (Green noting Monica has eight unique alleles relative to Johnston and Doe; 741-72 (Kalafut noting Johnston has three unique alleles relative to Monica and Doe)).

That there were other children who *could* have hypothetically contributed to the mixtures does not warrant the evidence's exclusion given the reality of the data and the testing conducted.[7] *Compare Lewis*,

---

[6]    In one instance, STRmix filtered out, or incorrectly dismissed, one allele peak in examining Stain 10. This is a known occurrence for which USACIL has a governing policy. (A:435-41, 671-89). Upon recognizing this phenomenon here, Green assigned that allele peak a "1," meaning Green directed STRmix to give no more or less weight to inclusion than exclusion (in other words, she mathematically neutralized this peak in the LR calculation). (A:435-41).

[7]    Any argument by Johnston and amici that USACIL did not, and could not, test the defense's preferred hypotheses using STRmix's relatedness function—for which it was not validated and thus fails to satisfy Rule 702—misapplies the law. Under *Daubert*, the Supreme Court requires expert testimony to be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509

17

442 F. Supp. 3d at 1158 (finding DNA evidence from four-person mixture sufficiently reliable even though analyst's NOC error rate was 60%, where case was not "particularly difficult or challenging," because defendant's DNA profile was consistent with that assigned to primary contributor and all of defendant's alleles across 21 loci were detected in the mixture) *with United States v. Ortiz*, 736 F. Supp. 3d 895, 903-05 (S.D. Cal. 2024) (precluding DNA evidence where analyst did not consider relatedness of individuals in assessing peak heights in low-template mixture and competing expert testified that two loci were true peaks, not artifacts, suggesting incorrect NOC).

---

U.S. at 591. Neither the district court nor Johnston cite to any precedent requiring a perfect match between the defendant's hypothesis and the analyst's testing to satisfy *Daubert*, and we are aware of none. Moreover, this position is untenable for the reasons outlined in the government's opening brief. (GBr.60-61). Here, in accordance with USACIL protocol, Green ran the "innocence" assumption in STRmix—testing Johnston's inclusion as a contributor to the mixtures versus not, and testing Doe's inclusion as a contributor to the mixtures versus not. (*See, e.g.*, A:432). Certainly, Johnston is entitled to cross-examine Green about her failure to test his preferred hypothesis and to test his hypothesis himself. *See Gissantaner*, 990 F.3d at 468. That Green did not use his preferred hypothesis, however, does not render the LRs calculated unreliable or irrelevant.

18

Amici emphasize the 2023 amendment to Rule 702 to argue that any dispute no longer goes to the weight of the evidence. Not so.

> Rule 702 requires that challenges to an expert's opinion go to the weight of the evidence only if a court first finds it more likely than not that an expert has a sufficient basis to support an opinion…[and] stay[s] within the bounds of what can be concluded from a reliable application of the expert's basis and methodology.

*Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).[8] Here, Green had more than a sufficient basis to support her opinion and stayed within the bounds of what can reasonably be concluded from a reliable application of her methodology.

C.    Failure to Parse Admissible Testimony is Error

For five of the six stains analyzed, no expert found evidence of the presence of a "masked" child. (A:538-39, 741-42, 765). Even assuming, contrary to the record, the two testifying experts disagreed as to the presence of a "masked" biological child in one of the six stains, the

---

[8]    The government is unaware of additional precedent from this Court post-dating the 2023 amendment regarding the admission of DNA evidence at trial; neither Johnston nor amici provide any. Other circuits have continued to affirm the admission of expert testimony where defense "is free to explore in depth on cross-examination" any challenges to reliability. *United States v. Seward*, 135 F.4th 161, 165 (4th Cir. 2025).

19

law is clear that where one portion of an expert's testimony is inadmissible, a court may admit other portions to the extent the remaining portions of her opinion can be distinguished. *See In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) (district court abused its discretion in precluding entirety of expert's testimony where only one part was inadmissible, which amounted to "throw[ing] the good out with the bad"). "This process of parsing expert testimony is consistent with Rule 702's liberal admissibility standards." *Id.*; *see Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22-23 (2d Cir. 1996) (per curiam) (parsing admissible and inadmissible portions of expert testimony).[9] To preclude all DNA evidence here, where there is no colorable argument of

---

[9]  "Rule 702 liberalized the admission of expert testimony as compared to the *Frye* test." *Engilis*, 151 F.4th at 1050. Yet, even assuming Green's analysis with regard to the singular four-contributor stain fails under the reliability analysis set forth in the 2023 amendment to Rule 702 (which it does not), there is no basis to conclude that it would be permissible to discard reliable testimony where it can be separated from the set. Indeed, both the pre- and post-2023 approaches rely upon a finding of reliability in the first instance. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d at 665 (noting "[w]hen faced with expert testimony that contains both reliable and unreliable opinions," it is proper to exclude only unreliable testimony); *McFee v. BJ's Wholesale Club, Inc.*, No. 21-CV-3087 (MKB), 2025 WL 2442837, at *11-12 (E.D.N.Y. Aug. 25, 2025).

a masked biological child in five of the six stains and where the evidence can easily be parsed, amounts to an abuse of discretion and should be reversed.

## II. The District Court Erred by Excluding Highly Relevant DNA Evidence

The district court further abused its discretion by precluding the DNA evidence as irrelevant. The court failed to analyze relevance in the context of the government's theory and to consider reasonable inferences the jury could draw from that evidence: namely, that Doe's DNA was not just on Johnston's bedspread, but in the same areas where Doe alleges she was raped by Johnston and where he deposited his semen. The court likewise failed to appreciate the import of the LRs Green calculated, which offered significant support for the conclusion that Doe's DNA was present in Johnston's semen stains. Based on those misunderstandings (which Johnston adopts), the court grossly undervalued the relevance of the DNA evidence.

Both Johnston and the district court disregard this Court's precedent in analyzing the relevance of the DNA evidence. First, relevance should be assessed in the context of the proponent's theory of

21

the case. *See In Re Pfizer Inc. Sec. Litig.*, 819 F.3d at 661. "To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). Rather, "so long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry." *United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006).[10]

Relevant here, the government's theory is that Johnston raped Doe on a specific date (April 2, 2021), in a specific location (in his bedroom, atop his bedspread). (GBr.65-66; A:973). The trial evidence would entail: Doe's testimony that on April 2, 2021, Johnston raped her on the end of his bed, atop the bedspread (where the DNA was recovered), during which he did not wear a condom and ejaculated inside and outside of her vagina (A:237; SA:165, 177-80, 219-20, 541 at 08:40-09:05; 3500-MS-009); agents' testimony that five days later they collected the

---

[10]    The inquiry under Rule 402 is consistent with the relevance inquiry under Rule 702. "Nothing in the [2023] amendment imposes any new, specific procedures." Fed. R. Evid. 702 Adv. Comm. Notes (2023).

22

bedspread and sent it to USACIL for DNA testing (A:220; SA:178-79, 198); and Green's testimony that:

- Six stains on the bedspread tested positive for semen (photographs and testimony will establish these stains are atop the bedspread, in the location where Doe reported being raped) (A:377-78, 446-55, 710-11; SA:6, 32);

- The semen did not contain sperm cells, consistent with having been ejaculated by a vasectomized male (which Johnston is) (A:453-54; 1004);[11]

- The bedspread had not been laundered since the semen was deposited (A:577-78);

- Five of the six stains contained DNA from just three people—Monica, Johnston, and Doe—and had no unaccounted-for DNA (A:418-24); and

- One of the six stains contained DNA from four people—Monica, Johnston, Doe, and an unknown individual—with no DNA being unaccounted for by those four individuals and with the unknown contributor providing just 1% of the DNA (A:262).

---

[11] The absence of sperm lends strong support for the conclusion that the semen was deposited by Johnston. (A:328, 422). He suggests as much. (Br.49). By contrast, nothing in the record supports a conclusion that the sperm-less semen was deposited by Johnston's son or stepson. *See* (A:37-38). When the bedspread was recovered, the stepson, who was born in December 2009, was 11 years old, and his son was four years old. (SA:483). The Order mistakenly refers to the stepson as being 12 years old, parroting the same error in Johnston's brief below. (A:977).

The foregoing would allow the jury to reasonably conclude that the semen was deposited by Johnston, and, in conjunction with Doe's testimony, that Doe's DNA was found in those semen stains because she was sexually abused there.

Nonetheless, the district court wrongly precluded the DNA evidence as irrelevant on the erroneous grounds that the DNA evidence "provides no information that can help answer the question of how, when, and under what circumstances any DNA from these three people was deposited on the bedspread," or "identify what substance(s)…actually produced the DNA profiles." (A:1049-50). The court thus improperly found that "Green's findings make the defense's explanation for the presence of Doe's and Johnston's DNA in these areas (that they were separately deposited during each person's ordinary contact with the bed) and the government's hypothesis (that they were deposited when Johnston raped Doe on the bed) *equally likely to be true*." (A:1050). Johnston's attempt to bolster the district court's reasoning likewise fails.

First, it is undisputed that DNA evidence cannot answer the questions of how or when DNA was deposited. (*See* A:585). That limitation—which exists in every case—is not a basis on which to

24

preclude DNA evidence. Rather, as other courts have recognized, for DNA evidence to have meaning, it must be coupled with other trial evidence. *See Gissantaner*, 990 F.3d at 470 (recognizing that DNA evidence alone could not answer the question of how the defendant's DNA was deposited on a firearm, but "[t]hat is what trials and juries are for"); *cf. Abu-Jihaad*, 630 F.3d at 132. Here, the district court (and Johnston) erred by failing to view the DNA evidence as part of the "mix of material information" to be presented at trial, *Quattrone*, 441 F.3d at 188, which includes Doe's testimony about when, where, how, and by whom she was raped.[12] (Br.50 (disregarding Doe's anticipated testimony as to the timing and location of her rape by Johnston)). Contrary to Johnston's claim (Br.53), the DNA evidence corroborates Doe's account of being vaginally raped on April 2, 2021—one of the key questions to be decided at trial—and makes her account more likely, underscoring the evidence's relevance.

---

[12] While Johnston notes that Green will not testify as to the activity that resulted in Johnston's semen and DNA being in the same location on the bedspread as Doe's DNA (Br.40), he fails to grapple with Doe's anticipated testimony establishing those facts.

Second, when the DNA evidence is evaluated holistically with the other anticipated trial evidence, it does not make an innocent explanation for Doe's DNA being found in Johnston's semen stains "equally likely."  In so finding, the court and Johnston wrongly rely on the facts that all children spent "innocent" time on the bed, and that Monica's DNA was found in each of the stains tested, neither of which support the court's conclusion.

To the contrary, the proffered testimony concerning the children's innocent use of the bed belies any suggestion that the DNA evidence renders equally likely the prospect that Doe's DNA was in Johnston's semen stains by virtue of innocent use.  When CID agents recovered the bedspread in April 2021, Monica advised the agents that the children wrestled on the bed.  (SA:171).  During an interview with Doe in March 2025, Doe advised, among other things, that Johnston would occasionally roughhouse with the children, including Doe, on the bed while all were clothed; her two youngest siblings slept in Johnston's bed every day; and she spent the least amount of time in that room although she sometimes used her computer tablet with her two youngest

26

siblings on Johnston's bed. (SA:537-38).[13] She further advised that neither she nor her siblings ate on that bed, and the only time she was naked on that bed was during the sexual abuse. (SA:538). Beyond occasional roughhousing, there was no suggestion that the stepson spent time on the bed.[14]

In the five three-contributor mixtures, Green and Kalafut detected the presence of just Johnston's, Doe's, and Monica's DNA. A jury certainly could fairly infer that if Doe's DNA was deposited in the same location as five of Johnston's semen stains while she was watching her tablet on that bed, clothed, with her youngest siblings, her youngest siblings' DNA would likewise be in those stains. But their DNA is not in those samples. Put otherwise, the DNA of children who spent "innocent" time on the bed, with and without Doe, was *not* found in the semen stains,

---

[13]     Johnston wrongly asserts, without citation, that Doe "regularly used the comforter." (Br.49).

[14]     Johnston makes much of the (irrelevant) fact that one of his younger children had at some point "wet the [marital] bed." (Br.41). That the bedspread had not been laundered since the semen was deposited undermines any suggestion that there had been any bedwetting since the relevant stains were deposited.

whereas Doe's DNA *was* found in each of those stains.[15]  Thus, the DNA evidence lends strong support for the conclusion that, consistent with Doe's anticipated testimony, her DNA was deposited in those semen stains because Johnston raped her there five days before the bedspread was recovered.  The data does not, as the court and Johnston claim, make innocent explanations "equally" likely.  (A:1050; Br.49-50).

Further, the evidence of Monica's DNA being present in the six stains shows that the DNA of individuals who simply slept in the bed, or roughhoused on the bed, was *not* found in the semen stains, whereas the DNA of individuals who had sex on the bed—namely, Johnston and Monica, and Johnston and Doe—appeared in the stains.  While the DNA evidence in a vacuum cannot answer when and how those stains were deposited, the trial evidence, including Doe's testimony and photographs concerning where on the bedspread the stains were found, will do so. Nothing about the government's argument or the proffered evidence forces the conclusion, as Johnston wrongly claims, that for Monica's DNA

---

[15]    Indeed, Doe was the major contributor to four of the five three-contributor stains.  (A:610, 701-05, 708-09).

28

to be present, she too must have been "involved in any sexual abuse," given the plausible, alternative explanation that she had sex with Johnston on the bedspread. (Br.51).

In the alternative, Johnston argues that the DNA evidence is irrelevant because one would expect Doe's DNA to be present, given her innocent use of the bed. (Br.44, 49). Yet, the DNA evidence is not simply that Doe's DNA is on the bedspread. Rather, the analysis determined that Doe's DNA was present in six semen stains that also contain Johnston's DNA. It is far from a foregone conclusion (as Johnston suggests (Br.53)) that a child who infrequently spent time on the bed, while clothed, would deposit DNA in semen stains on the bed, particularly where other children engaged in those innocent activities and their DNA was not found in those semen stains. In any event, Johnston has not offered to stipulate to this fact, and it remains something the government must prove.[16]

---

[16] Johnston misleadingly argues that Kalafut "testified, when the parties agree on whose DNA is on an item—like the comforter here— a likelihood ratio about whose DNA is on the item is just 'not relevant.'" (Br.50). Kalafut was asked if he agreed an LR would be irrelevant "where both parties agreed whose DNA it was." (A:843). While Johnston repeatedly argues that Doe's DNA was expected to be on the comforter,

Finally, that the LRs calculated are not couched in terms of the defense's current trial theory does not render the DNA evidence irrelevant. (A:1029-31; Br.2, 30, 37, 49-50). The LRs tested, among other things, the hypothesis that Doe's DNA was in the mixtures against the hypothesis that the DNA was contributed by an unknown, unrelated person. (A:432-33, 608-11, 697-709). The reported results indicating the presence of Doe's DNA spanned from the quadrillions to one quintillion, the upper threshold that USACIL allows analysts to report. (A:441, 445-46, 610). As Green testified, "the higher the number, that gives more support to the first idea, that the DNA is from [that] person," here Doe. (A:369). The LRs strongly support the conclusion that the semen stains contain Doe's DNA. *See Gissantaner*, 990 F.3d at 462. To the extent Johnston wishes to explore alternative hypotheses, including one involving unknown, *related* individuals, he may do so, through cross-examination or the introduction of competing evidence. *See Daubert*, 509 U.S. at 596 (citing "cross-examination" and "presentation of contrary

---

he has not conceded that her DNA was expected to be in Johnston's semen stains, which is what the evidence here shows and is a different question.

30

evidence" as "traditional and appropriate" tools to attack admissible evidence); *Gissantaner*, 990 F.3d at 468.

III. The District Court Erred by Significantly Overstating the Risks and Failing to Consider Mitigating Measures

The district court legally erred in its Rule 403 analysis, because it failed to fairly assess the probative value of the DNA evidence, as discussed above. *Cf. United States v. McDermott*, 245 F.3d 133, 140 (2d Cir. 2001) ("[W]hen reviewing a Rule 403 ruling, we must review the evidence maximizing its probative value and minimizing its prejudicial effect."). It also legally erred by overstating the risks the DNA evidence posed and by failing to consider the mitigating effect of a limiting instruction, cross-examination, or the introduction of contrary proof. *See United States v. Garnes*, 102 F.4th 628, 642 (2d Cir. 2024) (reversing district court order precluding probative evidence under Rule 403 for, *inter alia*, failing to appreciate mitigating effect of limiting or jury instruction); *United States v. Dupree*, 706 F.3d 131, 138 (2d Cir. 2013).

Specifically, the district court precluded the DNA evidence given what it perceived to be the risks of misleading and confusing the jury under Rule 403. The court opined that the jury would be unable to

31

comprehend that the DNA evidence "only speaks to *whose* DNA might be on the comforter but says nothing about how or when it got there," or that the LRs test the "likelihood of 'competing propositions'" and could thus not supply "conclusive evidence" as to the source of the DNA. (A:1056-58). Those limitations are true in every case involving DNA evidence, yet neither the district court nor Johnston have cited any case in which either was a basis on which to wholly preclude such common evidence.

More critically, the district court failed to consider the mitigating effect of cross-examination, the introduction of contrary evidence, argument to the jury, and limiting instructions. The omission is glaring.[17] Those curative mechanisms were discussed in cases relied

---

[17]   Amici also generally fail to account for our adversarial system, fashioning arguments in a vacuum and citing to articles that do not consider the ability of defense counsel to vigorously cross-examine expert testimony or the jury to weigh credible evidence. (*E.g.*, LA Br. 17-21). Defense counsel is fully capable of challenging testimony through in-depth questioning. Nowhere does Johnston (or amici) show that Green's analysis was wrong or wrongly applied on these facts, where the only two testifying experts agree, and where the defense's expert expressed no opposition. (DE:219; GBr.25). Indeed, what Johnston (and amici) advocate is contrary to our adversarial system of justice, which fundamentally empowers a jury, informed by the evidence (assuming the evidence satisfies certain thresholds as it does here) and argument from

upon by the court in its Order.  *See Daubert*, 509 U.S. at 596 (discussing

"cross-examination" and "presentation of contrary evidence" as means to

attack "shaky but admissible [expert] evidence"); *Gissantaner*, 990 F.3d

at 470 (noting that concerns over a jury's potential misunderstanding of

LR could be cured by requiring advocates "to describe it in a way that will

not generate 'unfair prejudice' or 'mislead the jury'"); *accord Garnes*, 102

F.4th at 634 (holding that district court significantly undermined the

probative value of the precluded evidence and erred in finding that a

limiting instruction "would only 'raise more questions than it answers'

for the jury").   In *Garnes*, this Court offered numerous examples of

effective limiting instructions that could be provided—including that the

jury consider the evidence "only for specified purposes" and that the

government "confine its use of the evidence to arguing" only as to

permissible purposes.  102 F.4th at 642.  Nonetheless, the court here

failed to consider the mitigating effect of an instruction, including those

proposed in *Garnes*.

---

both sides, to determine whether the government has met its burden of
proof.

33

Johnston attempts to dismiss the district court's failure to undertake an appropriate Rule 403 analysis—and ignores *Garnes*—by arguing that the district court correctly determined the evidence was irrelevant under Rule 401, and thus inadmissible. (Br.48). As shown above, the court's Rule 401 analysis was fatally flawed, as was its failure to undertake an appropriate Rule 403 analysis.

Johnston also argues that he would be prejudiced by this evidence because it is irrelevant and its introduction would falsely suggest otherwise. (Br.54-55). This argument is easily dismissed. As the government has shown, the evidence *is* relevant—indeed, probative— and thus its introduction will create no such prejudice. His counsel can cross-examine the government's expert, offer his own evidence if he so chooses, and advocate to the jury that the government's DNA evidence should not be credited.

Finally, Johnston claims that "[a]llowing the government to twist an innocent, undisputed, irrelevant fact" to argue guilt is unfairly prejudicial. (Br.55). Yet, in the face of relevant evidence and competing inferences, it is for the jury, not the court or Johnston, to decide which argument to believe. *See Garnes*, 102 F.4th at 640 n.4 (acknowledging

that it is for the jury to determine which of two competing inferences to accept); *Abu-Jihaad*, 630 F.3d at 132; *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995); *cf. United States v. Zottola*, Nos. 23-6378, 23-6401, 2025 WL 3137727, at *3 (2d Cir. Nov. 10, 2025) (summary order) (evidence not unfairly prejudicial under Rule 403 where, *inter alia*, "Zottola remained free to argue that the jury should draw other, non-incriminating inferences from the statements").

In sum, the government's proffered expert testimony regarding the DNA evidence arises from a reliable application of the expert's bases and methodology. Any critiques by Johnston or amici (as channeled by the district court) can be explored on cross-examination and addressed by arguments to the jury, which will decide the credibility and weight of this evidence. Contrary to the court's, Johnston's, and amici's arguments, the expert opinion here need not answer every question; other evidence serves that purpose. The expert analysis of DNA evidence will answer the simple question: whose DNA is present where? This evidence will be explained and corroborated by other trial evidence. To insist that DNA evidence must answer all questions (LA Br.32), is to ensure its exclusion in all cases. That is not the law.

35

<u>CONCLUSION</u>

For the reasons stated in this brief and in the government's principal brief, the district court's order excluding the DNA evidence should be reversed.

Dated:      Brooklyn, New York
           January 5, 2026

                            Respectfully submitted,

                            JOSEPH NOCELLA, JR.,
                            *United States Attorney*
                            *Eastern District of New York.*

                By:             /s/
                            TARA B. MCGRATH
                            MARGARET SCHIERBERL
                            Assistant U.S. Attorneys

AMY BUSA,
TARA B. MCGRATH,
MARGARET SCHIERBERL,
*Assistant United States Attorneys,*
     (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 6,956 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
          January 5, 2026

/s/AMY BUSA
AMY BUSA
Assistant U.S. Attorney